## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SUSAN B. ANTHONY LIST, *et al.*,

       Plaintiffs,

vs.

REP. STEVE DRIEHAUS, *et al.*,

       Defendants.

Consolidated Case No. 1:10-cv-720

Judge Timothy S. Black

### ORDER GRANTING DEFENDANTS OHIO ELECTION COMMISSION AND ITS MEMBERS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT OF THE COALITION OPPOSED TO ADDITIONAL SPENDING AND TAXES (Doc. 30)

This civil action is currently before the Court on Defendant Ohio Election Commission and its Members' motion to dismiss the second amended complaint of the Coalition Opposed to Additional Spending and Taxes ("COAST") (Doc. 30), and the parties' responsive memoranda (Docs. 35, 51). The Court heard oral argument on 7/12/11.

## I.    FACTUAL BACKGROUND

### A.    History

Before the 2010 general election, Plaintiff Susan B. Anthony List ("SBA List")[1] created advertising material stating "Shame on Steve Driehaus! Driehaus voted FOR taxpayer-funded abortion" (hereinafter referred to as the "Ad"). (Doc. 17 at ¶ 13).

---

[1] The SBA List is a 501(c)(4) organization designed to advance pro-life causes. (Doc. 1 at ¶ 10). Its five-part mission is "to elect pro-life women to Congress through its SBA List Candidate Fund," "to educate voters on critical pro-life women to Congress through its SBA List Candidate Fund," "to educate voters on critical pro-life issues and on upcoming legislation," "to train and equip pro-life activists nationwide to run successful political and grassroots campaigns," "to promote positive responses in both traditional and new media to dispel the myths and distortions of the abortion lobby" and "to advocate the passage of pro-life legislation in Congress, directly with legislators and through mobilizing direct citizen lobbying." (*Id.*)

SBA List intended for the Ad to be posted on billboards managed by Lamar Advertising Company ("Lamar"). (*Id.* at ¶ 14). SBA List alleges that Rep. Driehaus' counsel met with Lamar, and Lamar subsequently agreed not to post the Ad on its billboards. (*Id.* at ¶ 14). SBA List nonetheless disseminated the Ad, and similar statements, through other means. (*See id.* at Ex. 3 and 4).

On October 4, 2010, Defendant Rep. Driehaus filed a complaint against SBA List with the Commission[2] alleging that SBA List's publishing of the Ad violated two of Ohio's false statement laws, Ohio Rev. Code § 3517.21(B)(9) & (10), and Ohio's disclaimer statute, Ohio Rev. Code § 3517.20. (*Id.* at ¶¶ 15).

On October 14, 2010, the Commission held a probable cause panel to determine whether Rep. Driehaus' complaints should be referred to the full Commission. (*Id.* at ¶ 28). At the hearing, SBA List argued that its statement in the Ad did not violate Ohio's false statement statute because the statements were true. (*Id.* at Ex. 5, Tr. at 16:20-23) ("This bill allows for taxpayer funding of abortion for life, rape and incest. That's taxpayer funding of abortion."); (*Id.* at Tr. 19:18-23) ("It is the law that the advertisement refers to, it is the law that allows for federally funded abortions, and so that statement is categorically true, which we said about the congressman, and therefore this should be

---

[2] The mission of the Ohio Elections Commission is to enforce the provisions of Ohio Rev. Code §§ 3517.08, 3517.13, 3517.17, 3517.18, 3517.20, 3517.22, 3599.03 or 3599.031 with justice, equity and fairness, and to issue Advisory Opinions from those sections of law within the jurisdiction of the Ohio Elections Commission. The Commission will respond to and advise interested parties and the citizens of Ohio on matters concerning campaign finance and fair campaign practices in a fair and equitable manner. *See* http://elc.ohio.gov.

-2-

dismissed."). A three member panel of the Commission, by a vote of 2-1, nonetheless found probable cause and determined that Rep. Driehaus' false statement claims should be heard by the full Commission, and the panel set an administrative hearing before the full Commission for October 28, 2010. (*Id.* at ¶ 28; Ex. 5, at Tr. 29: 4-19).

Also at the October 14 probable cause panel meeting, the Commission dismissed Rep. Driehaus' claim that SBA List violated Ohio's disclaimer statute. (*Id.* at ¶ 29). SBA List had argued to the Commission that this claim should be dismissed because the federal disclaimer law preempts Ohio's disclaimer law. (*Id.* at Ex. 5, Tr. at 15:3-12). The Commission agreed with SBA List. Accordingly, the Commission dismissed Rep. Driehaus' disclaimer claim for "lack of jurisdiction." (*Id.* at Ex. 5, Tr. 27:6-7). After the probable cause meeting, the parties commenced with discovery. (*Id.* at ¶¶ 31-36).

On October 18, 2010, SBA List filed this federal lawsuit, requesting a temporary restraining order to enjoin the Commission proceeding. On October 25, 2010, this Court issued an Order denying the motion for temporary restraining order and staying the federal action under *Younger v. Harris*, 401 U.S. 37 (1971). SBA List immediately appealed to the Sixth Circuit and requested an injunction pending appeal, claiming that its speech was "chilled" because of the Commission proceeding. The Sixth Circuit denied the request for an injunction and specifically disagreed with SBA List's allegation that its speech was "chilled," holding that "SBA List clearly has not been enjoined from any speech, and all indications are that its speech continues to be robust." *Susan B. Anthony List v. Driehaus*, No. 10-4320 at 4.2.

-3-

Before the November election, Mr. Driehaus and SBA List agreed to postpone the Commission hearing scheduled for October 28, 2010. Mr. Driehaus subsequently lost his bid for re-election on November 4, 2010.

On November 12, 2010, Driehaus filed a motion to withdraw his complaints with the Commission before the Commission ever decided whether the Ad violated Ohio law. (Doc. 17 at ¶ 34). Indeed, the SBA List consented to that withdrawal. (Doc. 20). The motion was granted by the Commission on December 2, 2010, thereby terminating the Commission proceeding. (*Id.*)

On December 6, 2010, this Court lifted the stay on this action that it had imposed in its October 25, 2010 Order. (*Id.*) SBA List subsequently withdrew its appeal of the October 25, 2010 Order.

SBA List was not the only organization that was critical of Mr. Driehaus' vote in support of the federal health care reform legislation -- Plaintiff COAST was also critical of the vote. COAST is an unincorporated association of individuals that operates, and has registered with the Hamilton County Board of Elections, two political action committees, COAST Candidates PAC and COAST Issues PAC.

COAST[3] wanted to engage in political speech through its mass emailed

_____

[3] COAST's mission is to limit the rate of taxes and spending at the federal, state, and local level to within the rate of inflation and to stop the abuse of power by government officials. COAST advances this cause by consistent and principled adherence to limited government and lower taxes in fighting legislation and ballot initiatives that increase taxes and spending beyond the rate of inflation, and by supporting candidates for public office who advance these principles. *See* http://www.gocoast.org.

communications, on-line blog, and press releases, including COAST's desire to

disseminate an e-mail to its supporters containing First Amendment factual statements and

opinions related to Mr. Driehaus and his support of the federal health care reform

legislation. (Doc. 35 at 7). Some of the content of COAST's message was similar to the

message SBA List wanted to disseminate, but COAST's message also included criticism

directed at the Commission. In light of the lawsuit associated with SBA List, COAST

alleges that it was fearful of finding itself subject to the same fate. Accordingly, COAST

claims that in order to avoid being subjected to the same inquisition as SBA List, COAST

withheld dissemination of its proposed e-mail, as well as the posting or dissemination of

other comments relating to Mr. Driehaus' support of the federal health care reform

legislation and its alleged funding of abortions. (Doc. 35 at 9).

Alleging that its First Amendment free speech rights were being chilled, COAST

filed a complaint in this Court on October 27, 2010, which case was consolidated with the

Susan B. Anthony List case on November 19, 2010. (*See* Case No. 1:10cv754 at Doc. 9).

### B.    COAST'S Amended Complaint

On December 22, 2010, COAST filed its Second Amended Complaint alleging that

two of Ohio's false statement laws are unconstitutional on their face and as applied to

"citizens and organizations taking positions on political issues." (Doc. 26 at ¶¶ 75, 79).

COAST further alleges that Ohio's false statement and disclaimer laws are preempted by

federal election law when applied to candidates for federal office. (*Id.* at ¶¶ 80-93).

Finally, COAST claims that the "processes and procedures" of the Commission violate

COAST's "substantive and due process rights." (*Id.* at ¶¶ 94-100).

-5-

COAST's Second Amended Complaint does not allege that it has ever been a respondent/defendant in a Commission proceeding or that the Commission has ever enforced or threatened to enforce any of the challenged Ohio election laws against it. Instead, COAST bases its complaint on its subjective "fear" (*id.* at ¶ 45) that it may be subject to the challenged laws in the future, and that the existence of the Ohio laws have "tempered and/or chilled" (*id.* at ¶ 54) its First Amendment rights.  Specifically, COAST claims its speech has been, or will be, chilled in two ways.

First, COAST claims that before the November 2010 general election, it desired to send an email and post messages on its blog about (former) U.S. Representative Steve Driehaus' vote on the federal health care reform legislation.  (*Id.* at ¶ 36).  The document stated: "Despite denials, Driehaus did vote to fund abortions with tax dollars Ohio. Ohio Elections Commission complaint filed to obscure undeniable truth of his healthcare vote" (hereinafter referred to as "Driehaus email").  (*Id.* at ¶¶ 37-38, Ex. C).  COAST states that the Driehaus email was "a form of issue advocacy."  (*Id.* at ¶ 39).  Further, COAST recites that the statement in the email is true because "Obamacare allows for taxpayer-funded abortions."  (*Id.* at ¶ 24).

COAST alleges that it refrained from sending the Driehaus Email because it was "[f]earful of finding itself subject to the same fate as the SBA List, *i.e.,* dragged before an inquisitional government agency who will sit in judgment of the truth of political speech and being subjected to extensive and intrusive discovery."  (*Id.* at ¶¶ 45, 55).  Further,

-6-

COAST alleges that Rep. Driehaus intends to run for election again in 2012.[4] (*Id.* at ¶¶ 46-51). And, "[d]uring the 2012 election cycle," COAST desires to publish the "same or similar statements about other federal candidates who voted for Obamacare, as well as about candidates in local or state elections who either voted to support or voiced support of Obamacare." (*Id.* at ¶ 52). Without its requested injunction and declaration from this Court, COAST claims that it in "fear or threat of being accused of violating" Ohio law. (*Id.* at ¶¶ 57).

Second, COAST claims that it faces a "real and imminent prospect of being brought before" the Commission regarding statements that it desires to make about potential Cincinnati City Council candidates. (*Id.* at ¶ 65). COAST claims that some potential candidates for City Council support introducing street cars as a mode of public transportation in Cincinnati. (*Id.* at ¶¶ 59-63). These potential candidates allegedly believe that the annual operating costs of the street cars will be up to $3 million. (*Id.* at ¶ 61). COAST desires to publish statements during the upcoming election for City Council that the street cars will be nearly $9 million. (*Id.* at ¶ 64). COAST claims that it "has withheld and will continue to withhold" any dissemination of an email relating to the "true operating costs that will be associated with the street cars" because it "faces the prospects of being brought before the Ohio Elections Commission."[5] (*Id.* at ¶ 66, 68).

---

[4] However, reports now indicate that "[i]n June [2011] Driehaus, his wife and their three school-aged children will move to Swaziland for what he expects will be a two-and-a-half-year assignment [with the Peace Corps]." (Doc. 51, Ex. 1).

[5] On April 12, 2011, the Ohio Transportation Review Advisory Counsel withdrew $51.8 million that the panel had targeted for the streetcar funding. TRAC's decision leaves the city's $128 million-plus budget for the first phase of the project about $30 million short. TRAC's action "significantly complicates the streetcar's iffy future." Barry Horstman, "State Panel Yanks Streetcar Funding" The Cincinnati Enquirer, April 12, 2011.

### C. The Ohio Elections Commission

#### 1. *Initiating proceedings*

The Commission cannot initiate any proceeding or investigate any person or entity on its own initiative. Commission proceedings may only be initiated when a third party – such as the Ohio Secretary of State, an official at a county board of election, or an individual through affidavit based on sworn personal knowledge – files a complaint with the Commission. Ohio Rev. Code § 3517.153(A). The complaint must set forth facts sufficient to constitute a violation of an Ohio election law over which the Commission has jurisdiction. *Id.*; O.A.C. 3517-1-02(A). No criminal prosecution may commence for a violation of certain Ohio campaign finance laws, including Ohio Rev. Code § 3517.21, until a complaint has been filed in the Commission and the Commission's proceedings are complete. Ohio Rev. Code § 3517.153(C). Thus, the Commission may preclude, but does not initiate a criminal prosecution – only a prosecutor may initiate criminal proceedings.

#### 2. *Probable cause review*

Where a false statement complaint is filed within 90 days of a general election, Ohio's General Assembly has created a procedural system requiring the Commission to convene a three-member panel to review the complaint and "determine whether there is probable cause to refer the matter to the full commission for a hearing." Ohio Rev. Code §§ 3517.154(B); 3517.156(A) & (B). The probable cause panel must meet within three days after the complaint is filed, except that if good cause is shown to hold the meeting at

a later date, the panel meeting can be deferred for up to seven days after the filing of the complaint. Ohio Rev. Code §§ 3517.156(B); 3517.154(A); O.A.C. 3517-1-10(C). After reviewing the complaint, the three-member panel may do one of the following: dismiss the complaint; determine there is probable cause and refer the complaint to the full Commission; or request an investigator to investigate the complaint. Ohio Rev. Code § 3517.156(C). If the three-member panel determines there is probable cause, the Commission shall hold an adjudicatory hearing within ten days after the complaint is referred to the full Commission. Ohio Rev. Code § 3517.156(C).

The Commission's dismissal of an action after a finding of no probable cause is not subject to appeal. Ohio courts have explained that during a probable cause panel, the Commission is acting in an executive, rather than an adjudicative, function, and because the probable cause decision is not an adjudication, there is no provision for appeal. *Billis v. Ohio Elections Comm'n*, 766 N.E.2d 198, 201 (Ohio Ct. App. 2001). "By contrast, if the Commission proceeds past the preliminary review stage, finds probable cause, and holds a full hearing, [Ohio courts] have recognized the right to appeal" an adverse determination. *Robinson v. Ohio Elections Comm'n*, No. 04AP-495, 2004 Ohio App. LEXIS 5875, at *8-9 (Ohio Ct. App. Dec. 2, 2004).

### 3. *Limited discovery*

Prior to a full Commission hearing, the parties may conduct discovery, pursuant to the Ohio Rules of Civil Procedures. O.A.C. 3517-1-01(C); O.A.C. 3517-1-09(C). The Commission's administrative rules provide that before parties turn to the Commission to

compel discovery, parties may "reasonably submit to the request of another party and produce the necessary documents" and other discovery information without intervention by the Commission. O.A.C. 3517-1-09(A). If such efforts fail, an aggrieved party may "petition the commission to compel the necessary discovery." *Id.*

The Commission may seek to compel discovery, or attendance at a hearing, through issuance of subpoenas, but only to persons located in Ohio. Ohio Rev. Code § 3517.153(B). If, "in the reasonable judgment of the staff attorney," a party's request for subpoena is "overly burdensome or requested solely for the purpose of harassment or delay," the subpoena "shall not be issued." O.A.C. 3517-1-11(B)(3). If the recipient of a subpoena refuses to obey the Commission's subpoena or to be sworn or to answer as a witness, the Commission may apply to the Franklin County Court of Common Pleas under Ohio Revised Code Chapter 2705 (contempt proceedings). Ohio Rev. Code § 3517.153(B). Ohio courts have explained that a Commission subpoena will be enforced so long as: "(1) the inquiry is permitted by law; (2) the records sought are relevant to the matter in issue; and (3) the records' disclosure will not cause unreasonable costs and difficulty." *Ohio Elections Comm'n v. Ohio Chamber of Commerce*, 817 N.E. 2d 447, 455 (Ohio Ct. App. 2004).

### 4. *Prosecution*

Commission hearings are conducted in accordance with Ohio's Administrative Procedures Act found in Ohio Revised Code Chapter 119, the Ohio Rules of Civil Procedure, and the Commission's own administrative rules. Ohio Rev. Code § 3517.

157(D).  As in other agency hearings, parties may make opening and closing statements, examine and cross-examine witnesses, and introduce evidence and affidavits under the Ohio Rules of Evidence.  O.A.C. 3517-1-11(B).

After presentation of the evidence in a false statement case, the Commission may: (1) dismiss the case because the complainant has not met his or her burden of proof; (2) find a violation but determine that good cause exists not to refer the matter to a prosecutor; (3) find a violation, determine that good cause exists not to refer the matter for prosecution, but issue a public reprimand; or (4) refer the matter to the relevant prosecutor for him or her to make determinations and proceed as appropriate under Ohio law.  Ohio Rev. Code § 3517.155(A) and (D); O.A.C. 3517-1-11(B); O.A.C. 3517-1-14(D).  The Commission may not impose a fine for any violation of Ohio's false statement law.  Ohio Rev. Code § 3517.155(D)(2).

The Commission's referral of a matter to the county prosecutor does not mean that a criminal prosecution will occur.  As the Sixth Circuit explained in *Pestrak v. Ohio Elections Comm'n,* 926 F.2d 573 (6th Cir. 1991), "[t]he ultimate decision on prosecution is clearly made by the prosecuting attorney," and the Commission's recommendation for prosecution is similar to that of a "newspaper, Congressman, or private citizen urging a prosecutor to bring a certain prosecution."

## II.  STANDARD OF REVIEW

Defendants move for dismissal of this action under Rules 12(b)(1) and 12(b)(6) of

the Federal Rules of Civil Procedure, claiming that COAST lacks standing.  A motion to

dismiss for lack of standing is properly analyzed under Rule 12(b)(1), since "standing is

thought of as a 'jurisdictional' matter, and a plaintiff's lack of standing is said to deprive a

court of jurisdiction." *Ward v. Alt. Health Delivery Sys.*, 261 F.3d 624, 626 (6th Cir.

2001).  "For purposes of ruling on a motion to dismiss for want of standing, both the trial

and reviewing courts must accept as true all material allegations of the complaint, and

must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S.

490, 501 (1975); *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d

536, 540 (6th Cir. 2004) (citing *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th

Cir. 1996)).

The plaintiff has the burden of proving jurisdiction when the defendant challenges

subject matter jurisdiction under Rule 12(b)(1).  *Rogers v. Stratton Indus.*, 798 F.2d 913,

915 (6th Cir. 1986).  A facial attack, as in this case, challenges the sufficiency of the

pleading itself.  Where the Rule 12(b)(1) motion presents a facial attack, the Court accepts

the material allegations in the complaint as true and construes them in the light most

favorable to the nonmoving party, similar to the standard for a Rule 12(b)(6) motion.

*Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974).

### III.   ANALYSIS

Under the Constitution, federal court jurisdiction is limited to cases and controversies.  U.S. Const. art. III, § 2; *In re Cassim*, 594 F.3d 432, 437 (6th Cir. 2010).  Accordingly, "[t]he ripeness doctrine has developed 'to ensure that courts decide only existing, substantial controversies.'"  *Cassim*, 594 F.3d at 437 (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 399 (6th Cir. 2001)).  Nevertheless, "the ripeness doctrine arises 'both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'"  *Id.* (quoting *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 n.18 (1993)).  Accordingly, "'[t]he ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances.'"  *Id.* at 437-38 (quoting *Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir. 1985)).

#### A.    Ripeness

"If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed."  *Bigelow v. Michigan Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992).  "Ripeness is peculiarly a question of timing.  Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreement."  *Thomas v. Union Carbide Agr. Products Co.* 473 U.S. 568, 580 (1985).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not

-13-

occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). The ripeness inquiry turns on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983).

In determining whether a case is ripe, the Court looks to: "(1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Insomnia, Inc. v. City of Memphis, Tenn.*, 278 Fed.Appx. 609, 612 (6th Cir. 2008). The first factor indicates that "'[r]ipeness while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending.'" *Casden v. Burns*, 306 Fed. Appx. 966, 971 (6th Cir. 2009) (quoting *Nat'l Treasury Emp. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)). The second and third factors, however, "reflect the 'prudential aspect of ripeness.'" *Id.* at 972 (quoting *Nat'l Treasury Emp. Union*, 101 F.3d at 1427-28).

COAST alleges that the information it hopes to disseminate is true, *i.e.*, the Driehaus email contains "true statements" (Doc. 26 at ¶ 24) and the "true operating cost" of street cars in Cincinnati will be $9 million (*id.* at ¶ 66). Therefore, COAST has not even alleged any intention not to comply with Ohio's false statement statute, which is a

-14-

requirement for any ripe First Amendment claim.[6] *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002) ("In a First Amendment pre-enforcement challenge, the inquiry usually focuses on . . .whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute).

Moreover, the Commission cannot enforce any statute against COAST unless someone files a complaint with the Commission. No complaint has been filed against COAST. In order to determine how imminent the threat of prosecution is, this Court must determine: (1) how likely it is that a third party will initiate a third party complaint against COAST based on the statements in the second amended complaint; and (2) how likely it is that the Commission will actually enforce Ohio's false statement statutes. The ripeness analysis cannot simply focus on whether COAST has alleged subjective chill. Here, any possible enforcement depends on a hypothetical communication being disseminated, and a hypothetical person filing a complaint, and a hypothetical finding that there is probable cause to proceed on such complaint. Such speculation is far too attenuated for this Court to find a ripe claim.[7]

---

[6] COAST challenges a statute that does not, according to COAST, prohibit COAST's intended conduct.

[7] Moreover, even COAST's express language indicates the uncertainty of harm: "in light of the *prospect* or serious *potential* of finding itself dragged before an inquisitional governmental agency" (Doc. 35 at 10 (emphasis added)), COAST has and will continue to restrain and temper its speech so that it avoids violating Ohio Rev. Code §§ 3517.21(B)(9) and 3517.21(B)(10).

COAST argues that "jurisdictional issues such as standing and ripeness are determined at the time the lawsuit was filed." *Sierra Club v. United States Army Corp. of Eng'rs*, 446 F.3d 808, 814 (8th Cir. 2006). COAST alleges that when this action was commenced, *i.e.*, when this Court's subject matter jurisdiction was invoked, the SBA List was being subjected to inquisition by the Commission for making substantively the same statements that COAST wanted to disseminate, and therefore its claims are ripe.[8] However, just because a case may have been ripe when it was filed (although this Court is not concluding that COAST's case was in fact ripe), does not mean that it was not subsequently rendered moot.

Here, COAST has not demonstrated any imminent threat of enforcement, and no complaint against COAST has been or is pending before the Commission. Accordingly, the Court finds that COAST's claims are not yet ripe for review.

## B.    Standing

Standing is "the threshold question in every federal case." *Warth v. Seldin*, 422

---

[8] Since the time of its original October 2010 complaint (Doc. 35 at 16), COAST amended its complaint on December 12, 2010 (Doc. 10) and filed a second amended complaint on December 22, 2010 (Doc. 12), after SBA List and Mr. Driehaus agreed to dismiss the Commission proceeding. Additionally, the Commission moved to dismiss COAST's second amended complaint based on the allegations in that pleading, such as COAST's desire to make similar statements about federal health care legislation in 2012 and COAST's desire to make statements about a potential streetcar issue in the City of Cincinnati for the 2011 elections. Those allegations were not raised in the October 2010 complaint. If it is now COAST's position that the operative complaint is its original complaint, which only addressed the facts relating to Driehaus's 2010 Commission proceeding, then COAST's lawsuit is even more clearly moot.

U.S. 490, 498 (1975). There is a "conspicuous overlap" between the doctrines of standing and ripeness and the two "often converge[]." *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006). Nevertheless, they warrant separate analyses. "To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be 'fairly traceable' to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury." *Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)).

In order to satisfy the standing requirements of Article III of the United States Constitution, COAST must meet three requirements. Failure to establish any one of them deprives a federal court of jurisdiction to hear the suit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, [the plaintiff] must demonstrate he has suffered "an 'injury in fact' that is both concrete and particularized and actual or imminent." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61). Second, "the injury must be fairly traceable to the challenged action of [the defendant]." *Id.* Finally, [the plaintiff] must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

"Each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and

-17-

degree of evidence required at the successive stages of the litigation.' " *United States v. Salti*, 579 F.3d 656, 667 n. 11 (6th Cir. 2009) (citing *Lujan*, 504 U.S. at 561). "At the pleading stage, general factual allegations of injury . . . may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* A plaintiff who alleges a threat of prosecution that "is not imaginary or wholly speculative" has standing to challenge the statute. *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979).

COAST argues that due to the litigation with Mr. Driehaus, COAST faced a real and immediate threat of being prosecuted under the challenged statutes. (Doc. 35 at 20). COAST claims that it has established an injury in fact based on its "objective fear of prosecution" and "chill" of its speech because of Defendant Driehaus's previous complaints filed against SBA List. (Doc. 35 at 19-23). COAST cites a line of cases suggesting that the existence of a statute that chilled protected speech is sufficient to demonstrate an injury-in-fact because litigants should not be "required to await and undergo criminal prosecution." (Doc. 35 at 20, 23 (citing *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979); *St. Paul Area of Chamber of Commerce v. Gaertner*, 439 F.3d 481 (8th Cir. 2006); and *Majors v. Abell*, 317 F.3d 719 (7th Cir. 2003)).

All of these cases are distinguishable from the instant case. First, the plaintiffs alleged a specific intent to pursue conduct in violation of the challenged

statute.[9] Here, COAST claims that its *intended* speech is true and does not violate Ohio's false statement law. (Doc. 26 at ¶¶ 24, 66). Second, in the cases COAST cites, the statutes at issue infringe on constitutionally protected speech. Here, Ohio's false statement statute does not encroach upon any constitutionally protected speech.[10] Third, the Commission lacks the power to initiate prosecution in false statement cases and COAST only speculates as to the likelihood of any prosecutorial threat. Thus, here the Court finds that such speculative threat of future, groundless action is insufficient for COAST to establish standing to proceed.

Additionally, COAST claims that if SBA List establishes standing, COAST's claims are justiciable as well. (Doc. 35 at 17). COAST cites *Bowsher v. Synar*, 478 U.S. 714, 718 (1986), for this proposition. In *Bowsher*, two separate yet "virtually identical lawsuit[s]" challenged a statute's constitutionality. *Id*. at 718. The cases were

---

[9] For example, in *St. Paul*, three non-profit corporations wanting to make political expenditures challenged Minnesota's state laws prohibiting corporations from making contributions to candidates. 493 F.3d at 483-84. The district court dismissed the case for lack of standing because the government defendants had not threatened any enforcement of the law against the plaintiffs. *Id*. at 484. The Eighth Circuit reversed, holding that when a plaintiff alleges an intention to engage in conduct "proscribed by a statute," there exists a credible threat of prosecution regardless of whether there had been actual threatened enforcement. *Id*. at 485. Because the plaintiffs asserted that they desired to make political expenditures, and the Minnesota statutes at issue, "on their face," prohibited the corporate political expenditures, the plaintiffs had standing. *Id*. at 485.

[10] *See, e.g., Pestrak*, 926 F.2d at 577 ("false speech, even political speech, does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth"); *Briggs v. Ohio Elections Comm.*, 61 F.3d 487, 494 (6th Cir. 1995) (Ohio's false statement statute "poses no First Amendment difficulty so long as it regulates only false speech made knowing of the falsehood or in reckless disregard for the truth").

consolidated, and the district court independently determined that the plaintiffs in each

lawsuit had standing. However, as the Court in *NRA of America v. Magaw*, 132 F.3d 272,

278 n.4 (6th Cir. 1997) explained:

> [t]he Supreme Court has stated, there is no need to address the
> standing of the other respondents, whose position is identical . . .
> In contrast, in the present case, we deem it necessary to inquire
> about the standing of each category of plaintiffs because their
> positions are not identical. The injury-in-fact pled by the Group
> I plaintiffs is very different from that of Group II or Group III.

Thus, this Court finds that while the *Bowsher* reasoning may apply if multiple plaintiffs

presented identical lawsuits, that reasoning does not apply here because COAST and the

SBA List lawsuits are not identical. The lawsuits are different in the following ways:

(1) COAST raised two additional claims for relief (Counts V & VI); (2) COAST raises a

due process claim against the Commission's processes and procedures, which SBA List

does not allege; and (3) COAST seeks relief for statements that it *desires* to publish

related to the potential streetcar issue in Cincinnati. (Doc. 26 at ¶¶ 48-70, 80-87).

Accordingly, this Court finds that COAST does not have standing.[11] Therefore,

because this Court lacks subject matter jurisdiction, the remaining substantive issues shall

not be addressed.

---

[11] *See, e.g., All Children Matter v. Brunner*, No. 2:08cv1036, 2011 U.S. Dist. LEXIS 13866
(S.D. Ohio Feb. 11, 2011), where the court dismissed a plaintiff's First Amendment challenge to
a broad range of Ohio campaign finance laws finding that ACM, a non-profit corporation
intending to engage in issue-oriented campaign speech, failed to provide any evidence "to
demonstrate that it has suffered or will suffer an imminent harm through enforcement" of the
challenged statutes. *Id.* at 14. Rather, AMC only offered its "subjective speculation that the
government may in the future take some action detrimental to ACM." *Id.* at 8. "The Court is
left only with ACM's scenario of possible events that could lead to, someday, a possible injury.
That . . . risk remains too remote to confer standing." *Id.* at 15.

## IV.    CONCLUSION

Accordingly, Defendants' motion to dismiss COAST's second amended complaint

(Doc. 30) is **GRANTED**.

**IT IS SO ORDERED.**

Date:  _8/1/11_

Timothy S. Black
United States District Judge