# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

SUSAN B. ANTHONY LIST, *et al.*,

      Plaintiffs,

vs.

REP. STEVE DRIEHAUS, *et al.*,

      Defendants.

Consolidated Case No. 1:10-cv-720

Judge Timothy S. Black

## ORDER DENYING PLAINTIFF SUSAN B. ANTHONY LIST'S MOTION FOR SUMMARY JUDGMENT ON DEFAMATION (Doc. 34)

This civil action is currently before the Court on Plaintiff Susan B. Anthony List's

("SBA List's") motion for summary judgment on Mr. Driehaus's counterclaim for

defamation (Doc. 34), and the parties' responsive memoranda (Docs. 53, 58). The Court

heard oral argument on 7/12/11.

## I.  FACTUAL BACKGROUND[1]

Mr. Driehaus's counterclaim for defamation involves five allegedly defamatory

statements: (1) SBA List's statement on or about August 9, 2010 that Mr. Driehaus

"voted for a health care bill that includes taxpayer-funded abortion."; (2) SBA List's

planned billboard, made public on September 28, 2010, which stated: "Driehaus voted

FOR taxpayer-funded abortion."; (3) SBA List's statement released on October 7, 2010:

"It is a fact that Steve Driehaus has voted for a bill that includes taxpayer funding of

abortion."; (4) SBA List's other statement of October 7, 2010 that Mr. Driehaus "ordered

Lamar Companies not to put up the billboards until the matter was settled by the Ohio

---

[1] A comprehensive factual background of this case is available at Docs. 64 and 65.

Elections Commission."[2]; and (5) SBA List's radio ad, which started running on or about October 19, 2010, stating: "Steve Driehaus voted for taxpayer funding of abortion when he cast his vote for the health care reform bill . . . Driehaus voted for taxpayer funding of abortion."[3] (Doc. 18 at ¶¶ 19, 20, 26, 27).

Mr. Driehaus claims that the statements defamed him by impugning his professional reputation as a pro-life Member of Congress and by falsely characterizing his performance and conduct while in office. (Doc. 18 at ¶ 39). Mr. Driehaus alleges that SBA List's statements characterizing his vote on the Patient Protection and Affordable Care Act ("PPACA") were false and were made with the intended effect of deceiving the electorate as to Mr. Driehaus's position on abortion. (*Id.* at ¶ 2). As a result, Mr. Driehaus maintains that he suffered reputational and other economic damage. (*Id.* at ¶ 41).

SBA List moves for summary judgment[4] on the counterclaim, alleging that the statements are: (1) protected opinion; (2) not capable of defamatory meaning; and (3) not false or made with actual malice.

---

[2] This will be referred to as the "ordered statement."

[3] The statements referenced in 1, 2, 3, and 5, will be referred to as the "taxpayer funded statements."

[4] SBA List moved for summary judgment on February 24, 2011, 24 days after Mr. Driehaus filed his answer and counterclaim. (Doc. 34). On March 10, 2011, the parties conducted an abbreviated Rule 26(f) conference, the prerequisite to serving discovery. (Doc. 48). Mr. Driehaus intends to conduct discovery regarding "the range of SBA List's statements and their falsity; SBA List's knowledge; SBA List's actual malice; punitive damages issues; [and] third-party discovery regarding SBA List's alleged reliance on other organizations' positions and regarding the 'ordered' statement by SBA List." (Doc. 48 at 3).

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## III. ANALYSIS

### A.   Protected Opinion

SBA List maintains that the defamation claim fails as a matter of law because the statements are protected opinion. (Doc. 34 at 9).

The Ohio Constitution goes beyond the federal Constitution in that certain false statements of opinion are protected. This protection exists as a separate and independent guarantee ancillary to freedom of expression and requires a reviewing court to determine whether the language in question is fact or opinion. *Vail v. Plain Dealer Publ'g Co.*, 649

-3-

N.E.2d 182 (Ohio 2005), *cert. denied*, 516 U.S. 1043 (1996).  The test for deciding

whether a statement is fact or opinion is an objective one based on a totality of

circumstances.  *Wampler v. Higgins,* 752 N.E.2d 962 (Ohio 2001).  Under this test, a

court should consider four factors: "First is the specific language used, second is whether

the statement is verifiable, third is the general context of the statement, and fourth is the

broader context in which the statement appeared."  *Id.* at 976-77.  The totality of the

circumstances test is very flexible, and when reviewing all four factors, the weight given

any one factor will vary depending on the circumstances of each case.  *Vail,* 649 N.E.2d

at 185.  "This analysis is not a bright-line test, but does establish parameters within which

each statement or utterance may stand on its own merits rather than be subjected to a

mechanistic standard."  *Id.*

On October 7, 2010, SBA List disseminated the following written statement by its

President, Marjorie Dannenfelser: "It is a fact that Steve Driehaus has voted for a bill that

includes taxpayer funding of abortion."  (Doc. 7, Ex. 1 at 7).  This mirrored similar

statements that SBA List made about Mr. Driehaus's PPACA vote in the same time

frame.[5]  In the same October 7th statement, SBA List stated that Mr. Driehaus had

"ordered Lamar Companies not to put up the billboards until the matter was settled by the

---

[5] *See* the other "taxpayer funding" statements: Doc. 7, Ex. 6 at 1-2 (August 9, 2010 SBA List press release stating that its bus tour would "focus on educating voters that their representative voted for a health care bill that includes taxpayer-funded abortion and betrayed their pro-life constituents," mentioning Steve Driehaus by name); Doc. 7, Ex. 5 (text of SBA List billboard, released September 28, 2010: "Driehaus voted FOR taxpayer-funded abortion."); Doc. 7, Ex. 16 (text of October 2010 SBA List radio ad: "Steve Driehaus voted for taxpayer funding of abortion when he cast his vote for the health care reform bill . . . Driehaus voted for taxpayer funding of abortion.").

Ohio Elections Commission." SBA List claims that these statements are nothing more than expressions of its opinions, which deserve "protected" status under Section 11, Art. 1, of the Ohio Constitution.

### 1. Specific Language

When reviewing the specific language used in a statement, courts must focus on how the reasonable reader would understand the statement. *Vail*, 649 N.E.2d at 185. In doing so, courts must examine the common usage or meaning of the allegedly defamatory words themselves in order to determine whether the statements at issue have a concise meaning that are likely to give rise to clear factual implications. *Wampler*, 752 N.E.2d at 978. "Statements that are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation." *Id.* at 978 (quoting *Ollman v. Evans*, 750 F.2d 970, 980 (D.D.C. 1984)).

> "Objective cautionary terms, or 'language of apparency' places a reader on notice that what is being read is the opinion of the writer. Terms such as 'in my opinion' or 'I think' are highly suggestive of opinion but are not dispositive, particularly in view of the potential for abuse . . . We are not persuaded that a bright-line rule of labeling a piece of writing 'opinion' can be a dispositive method of avoiding judicial scrutiny. Such labeling does, however, strongly militate in favor of the statement as opinion."

*Id.* at 981.

### a. Taxpayer Funded Statements

Ohio courts have recognized that, when the allegedly defamatory statements are accompanied by explicit language professing its truth, reasonable readings normally view

the statement as conveying information of a factual nature, rather than as expressing an opinion. *See, e.g., Sneary v. Baty*, 128 Ohio App.3d 142, 146-47 (1998) ("these are the facts"); *Mallory v. Ohio Univ.*, No. 01AO-278, 2001 Ohio App. LEXIS 5720 at * 7 (Ohio App. Dec. 20, 2001) ("this is what happened"); *Citizens to Save Northland v. Ohio Elections Comm'n*, No. 01AP-115, 2001 Ohio App. LEXIS 5904, at *15 (Ohio App. Dec. 27, 2001) ("Believe it or not this is actually happening.").

Ms. Dannenfelser, president of SBA List, stated: "*It is a fact* that Steve Driehaus had voted for a bill that includes taxpayer funding of abortions." (Doc. 7, Ex. 1 at 7) (emphasis added). In that same statement, she promised that SBA List would "spend more resources to make sure Steve Driehaus'[s] constituents *know the truth* of his vote." (*Id.*) (emphasis added). Additionally, in her October 2010 radio ad, Ms. Dannenfelser's statement was that: "Steve Driehaus voted for taxpayer funding of abortion" and is identified as "the truth" that Mr. Driehaus "doesn't want you to know" but that "you deserve to hear." (Doc. 7, Ex. 16). Finally, in a fundraising letter, Ms. Buchanan, the SBA List executive director, states that SBA List was defending "the truth" about Mr. Driehaus's vote for taxpayer funding of abortion in Obamacare. (Doc. 7, Ex. 17 at 1-2).[6]

---

[6] "Rep. Steve Driehaus is trying to hide from his vote for taxpayer funding of abortion in Obamacare. Help us spread the truth about his vote . . . [Rep. Driehaus'] doesn't like that we were sharing the truth with his constitutents . . .We absolutely cannot back down, but we need you to stand with us now. Please help us defend ourselves and redouble our efforts to share the truth about Rep. Driehaus'[s] vote with his constitutents. Please stand with us now by contributing the most you can. Rep. Driehaus knows the truth and wants to hide it . . . [W]e will not be intimidated and we will stand strong because we know that the truth is on our side. Steve Driehaus'[s] constitutents deserve to know the truth . . . Marjorie [Dannenfelser] and I, and the whole SBA List team appreciate your prayers as we defend the truth." *Id.*

Accordingly, this Court finds that because each allegedly defamatory statement was expressly referred to as "a fact" or "the truth," any reasonable reader would understand that the taxpayer funded statements conveyed information of a factual nature.

Finally, Plaintiff argues that "taxpayer funded abortion" is an ambiguous term without common meaning.[7] SBA List has consistently used the terms and/or phrase "taxpayer funding of abortion," "taxpayer-funded abortion," and "federal funding of abortion" to indicate money derived from tax revenues that had been appropriated by law to pay for abortions. (*See, e.g.*, Doc. 7, Ex, 3, Ex. 5, Ex. 9 at 9, Ex. 17 at 1-2). It is nonsensical to find that a nationally recognized organization would consistently use ambiguous terms to convey its message.[8] This Court finds that given the common meaning that reasonable readers would ascribe to the phrase, the taxpayer funded

---

[7] Specifically, Plaintiff argues that its statements were similar to those in *Vail*, and accordingly, the Court should consider the statements to be indefinate. In *Vail*, the Court found that the specific language of the statement at issue, including the terms "anti-homosexual diatribe" and fostering "homophobia," could hardly be defined with clarity because "each term conjures a vast array of highly emotional responses that will vary from reader to reader." *Vail*, 649 N.E.2d at 186-187. Unlike the language in *Vail*, the phrase "taxpayer funded abortion" is clear on its face. Moreover, in *Vail*, the Court emphasized the fact that the statements at issue were from the forum section of the newspaper under a subheading titled "commentary." Accordingly, it was clear from the context that the statements in *Vail* were editorial.

[8] Moreover, in a Google search, the phrase "taxpayer funded abortion" returned approximately 536,000 results, which further supports a finding that the phrase is commonly used. In fact, the "No Taxpayer Funding for Abortion Act" Bill was introduced to the 112th Congress. The bill passed the House on May 4, 2011. The purpose of the bill is "to prohibit taxpayer funded abortions." *See* http://www.govtrack.us/congress/bill.xpd?bill=h112-3. If Congress is using the phrase "taxpayer funding for abortion" it is cleraly a well established phrase.

statements convey information of a factual nature, specifically that the law in question contains a provision that appropriates money derived from tax revenues to pay for abortions.

### b. Ordered Statements

When the general tenor of the words used in an allegedly defamatory statement is typical of language "communicating a fact," as opposed to hyperbole, it suggests the statement is one of fact, rather than opinion. *Vail*, 649 N.E.2d at 186. This Court finds the statement "Rep. Driehaus ordered Lamar Companies not to put up the billboards" is clear on its face.[9]

### 2. Verifiability

The second prong asks whether the allegedly defamatory statement is verifiable. This prong of the test is used to determine whether the allegedly defamatory statements at issue "are objectively capable of proof or disproof." *Wampler*, 752 N.E.2d at 979. "A reader cannot rationally view an unverifiable statement as conveying actual facts." *Ollman*, 750 F.2d at 981. In other words, the court must determine whether the statements are "subject to proof or disproof upon the application of facts to an accepted legal standard." *Wampler*, 752 N.E.2d at 129. If the author implies that he or she has such knowledge to support the expressed opinion, "the expression of opinion becomes as

---

[9] SBA List declined to make any argument regarding the specific language of the ordered statement.

damaging as an assertion of fact." *Scott v. The News-Herald,* 496 N.E.2d 699, 707 (1986). However, if the opinion does not have a plausible means of verification, a reasonable reader will normally presume that there is no specific factual content to support the statement. *Condit v. Clermont Cty. Review*, 675 N.E.2d 475, 478 (Ohio 1996).

### a.    Taxpayer Funded Statements

Mr. Driehaus argues that the "taxpayer funded abortion" statements consist of two objectively verifiable statements: (1) how he voted on the PPACA is verifiable because it can be looked up in the Congressional Record;[10] and (2) the statements are verifiable by searching the PPACA for an appropriation of funds for abortion.

SBA List argues that the proper characterization of the PPACA is the heart of the dispute and that the statements are not objectively verifiable because Mr. Driehaus's explanation of the PPACA is a characterization of how legislative funding operates. (Doc. 53 at 9). Additionally, SBA List claims that in forming its opinion and characterizing the PPACA, it relied on a memorandum issued by the CRS[11] titled "High

---

[10]  SBA List does not dispute how Mr. Driehaus voted on the PPACA.  (Doc. 58 at 4).

[11]  The Congressional Research Service ("CRS") works exclusively for the United States Congress, providing policy and legal analysis to committees and Members of both the House and Senate, regardless of party affiliation.  As a legislative branch agency within the Library of Congress, CRS has been a valued and respected resource on Capital Hill for nearly a century. CRS is well-known for analysis that is authoritative, confidential, objective, and nonpartisan. *See* http://www.loc.gov/crsinfo.

Risk Pools Under PPACA and the Coverage of Elective Abortion Services." (Doc. 34, Ex. 2 at ¶ 11). SBA List alleges that the contradicting characterizations of the PPACA by SBA List and Mr. Driehaus, both relying on the CRS, demonstrate that its statements are opinion and constitutionally protected.[12]

Upon a careful review of both of the CRS memoranda cited by the parties, this Court fails to identify any affirmative statement that the PPACA includes taxpayer funded abortion. Contrary to SBA List's argument, the Court rejects that the notion that the verifiability of the alleged statements hinge on "characterizations" of the PPACA. Either the Act includes language indicating that it will fund abortion or it does not.[13] The sole fact that two groups "characterize" memoranda or an Act differently does not fundamentally render its content ambiguous. Whether it is possible, under contingent circumstances, that at some point in the future, upon the execution of x, y, and z, that the PPACA would not prevent taxpayer funded abortion is entirely different from providing for "tax-payer funded abortion." The express language of the PPACA does *not* provide for tax-payer funded abortion. That is a fact, and it is clear on its face.

---

[12]   SBA List further argues "that even the President thought the PPACA might fund abortion services which led him to issue Executive Order 13535." (Doc. 7, Ex. 15 at 5, 13)." Again, SBA List mischaracterizes the facts. SBA List's accusation is conjecture and moreover is inconsequential for the Court's purposes. Instead, what is germane to this analysis is that the Order further confirms that the PPACA does not fund abortion.

[13]   The only way the PPACA "includes" funding is if there is an appropriation that identifies specific funds and directs those funds to "abortions." (Doc. 53 at 9; Ex. 1 at ¶ 16). However, the PPACA does not contain such a provision.

Furthermore, SBA List cites *Herbert v. Oklahoma Christian Coal.*, 992 P.2d 322

(Okla. 2001), to support its position. SBA List claims that *Herbert* is applicable because

Ohio's constitutional provision is nearly identical to that in *Herbert*. The court in *Herbert*

explained that the statements at issue about the plaintiff-candidate, published by the

defendant in a voter guide, "cannot be proven true or false because they are defendant's

opinions or conclusions based upon its review of plaintiff's votes on certain issues and on

materials from other organizations." *Id.* at 327. Similarly, SBA List claims that it

conducted a careful review of Mr. Driehaus's vote before it issued its statements and

therefore the holding in *Herbert* should be applied to the instant case. However, *Herbert*

involved a subjective accusation that the plaintiff "supports . . . taxpayer funding of

abortion clinics...." The Court concluded that the "supports" accusation was not

verifiable because the plaintiff had not voted on any abortion bills. *Id.* The language in

*Herbert* ("supports") was ambiguous, in contrast to the language in the case at bar.

Accordingly, *Herbert* is inapplicable in this instance.

        **b.**    **Ordered Statement**

SBA List argues that the ordered statement is not objectively provable because it

was based on the October 4, 2010 letter from Mr. Driehaus's counsel to Lamar

Advertising and "[a]nother reader could read the same correspondence and use different

[sic] statement to describe the correspondence's import." (Doc. 34, Ex. 1 at 17). SBA

List confirms that it relied on the October 4th letter for information as to why Lamar

-11-

Advertising was not going to erect its billboards.  SBA List's Executive Director admits

that the letter said this standstill [in not erecting the billboard] was due to "an agreement"

between Lamar Advertising and Mr. Driehaus.  (Doc. 34, Ex. 3 at ¶ 12).  SBA List alleges

that the ordered statement was simply its interpretation of the letter.  (Doc. 25 at ¶ 14; Ex.

2).  Mr. Driehaus argues that an accusation that he "ordered Lamar Companies not to put

up the billboards" is quite different from the existence of an agreed standstill.

It appears, from the express language of the letter, that SBA List exaggerated the

clear import of the agreement between Mr. Driehaus and Lamar Advertising.  However,

this Court recognizes that "where the question of truth or falsity is a close one, a court

should err on the side of nonactionability."  *Philadelphia Newspapers, Inc. v. Hepps*, 475

U.S. 767, 776 (1986), *cert. denied*, 486 U.S. 825 (1988).   At this stage in the litigation,

whether the ordered statement is objectively verifiable has yet to be determined.

### 3.    Context

The third prong requires that courts look at the immediate context in which the

statements at issue appear.  *Wampler*, 752 N.E.2d at 130.  "We examine more than simply

the alleged defamatory statements in isolation, because the language surrounding the

averred defamatory remarks may place the reasonable reader on notice that what is being

read is the opinion of the writer."  *Id.*  For example, if apparently defamatory statements

are contained in a letter clearly meant to be a persuasive statement of the declarant's

opinion, then they are not actionable.  *Jorg v. Cincinnati Black United Front*, 792 N.E.2d

-12-

781, 786 (Ohio App. 2003) (statements in the letter were not defamatory since the letter was advocacy, not objective news).

### a.    Taxpayer Funded Statements

The August 9th, September 28th,[14] and October 7th[15] statements all appeared in releases.  An additional statement was released in late October via radio ad.

SBA List claims that the context in which the statements were made demonstrates that they are opinion and not fact.[16]  SBA List alleges that its statements were made in the context of its own "releases," located on its website, and sent by e-mail message to self-selected recipients.  Accordingly, SBA List claims that these attributes place an ordinary reader on notice that it is SBA List's own speech expressing its opinion rather than providing a "news story which should contain only statements of fact or quotes of others." *Vail*, 649 N.E.2d at 185.

However, there is no *per se* rule that general releases or radio ads exclusively contain opinions and never assert facts.  The language surrounding the August 9th statement speaks of "educating voters that their representative voted for a health care bill

---

[14] "Driehaus voted FOR taxpayer-funded abortion" was contained in a photo of the planned SBA List billboard.  (Doc. 7, Ex. 4).

[15] "It is a fact that Steve Driehaus has voted for a bill that includes taxpayer funding of abortion."  (*Id.*)

[16] The "ordered" and "taxpayer funded abortion" statements appeared in the same release. (Doc. 7, Ex. 7).

that includes taxpayer-funded abortion." References to voter education and information generally does not suggest that the speaker is imparting opinions rather than facts. As to the October radio ad, SBA List contends that disclaimer language indicating that the ad was paid for and that SBA List was "responsible for the content" would "place the reasonable reader on notice that the statement is one of opinion rather than fact." However, the mere fact that SBA List paid for this ad and dictated its content does not change the content of the ad which was that "you deserve to hear" "the truth" about Steve Driehaus's vote and that "the truth" is that he "voted for taxpayer funding of abortion." (Doc. 7, Ex. 16).

Despite the context of these ads, this Court finds that the language of the statements which convey "facts" and are intended to education the voter, does not signal that the speaker is imparting opinions rather than facts.

### b.    Ordered Statement

SBA List claims that the ordered statement "was published in a press release 'Press Statement' released by SBA List following an Elections Commission proceeding," and therefore would be construed as SBA List's opinion. (Doc. 34, Ex. 1 at 17). However, the document (Doc. 7, Ex. 1) never mentions that it is a press release or press statement, just that it is a statement. Moreover, it could not have been released "following an Ohio Elections Commission proceeding," because no such proceeding had yet taken place. Regardless, a statement in a press release that purports to have

"described the events, which had taken place previously" (Doc. 34, Ex. 1 at 17), does not indicate that it is anything other than a factual report of what happened.

### 4. Broader Social Context

The final prong involves a determination of the influence that certain well established genres of writing will have on the average reader. *Ollman,* 750 F.2d at 984. For instance, in both *Vail* and *Ollman* the courts found that because a statement was on a newspaper's opinion pages, the average reader was less likely to believe that the statement was one of objective fact.

### a. Taxpayer Funded Statements

SBA List claims that its reputation as a well-known, pro-life issue advocacy organization is similar to a well-known commentator, and should be considered. *Vail,* 649 N.E.2d at 186 ("The author's reputation as an opinionated columnist should also be considered."). However, despite the fact that SBA List is an issue advocacy organization, the thrust of the statements clearly advance their factual veracity. *See, e.g.,* "As soon as we were aware of the fact that there was public funding of abortion in there, we strongly opposed it."[17]; "So the fact of the matter is, we've said from day one, at Susan B. Anthony List, that public funding of abortion is in this bill."[18]; "he literally voted for taxpayer

---

[17]  Marilyn Musgrave, Project Director of the SBA List, speaking on August 10, 2010 on the SBA List bus tour.  (Doc. 53, Ex. 3).

[18]  *Id.*

-15-

funding of abortion in a bill."[19]; "Thank goodness the truth had – we can actually be grateful for the process because now folks know that it really is in there."[20]; "The SBA List will continue to defend that truth."[21]  Again, the express language of the statements is so matter-of-fact, that it predominates their context in this instance.

###### b.    Ordered Statement

SBA List claims that "[t]he broader context of the ["ordered"] statement is that the press statement was released in the final days of an election campaign, in the wake of landmark legislation, about which SBA List had been extremely opinionated, and furthermore it was published in the aftermath of a proceeding to which SBA List was a party." (Doc. 34, Ex. 1 at 17-18).  Mr. Driehaus claims that this is inaccurate as the document never mentioned that it was a press release or press statement and no Ohio Elections Commission proceeding had yet taken place.  Moreover, the statement had nothing to do with the "broader" months-long health care reform debate, as it was an account of something that had happened only three days earlier.  By Ms. Buchanan's own admission, the broader context of the ordered statement was the October 4th letter, which SBA had obtained and read by the time it decided to release its statement about Lamar Advertising.

---

[19]  Bill Cunningham on Demand, Interview with Marjorie Dannenfelser, October 20, 2001. (Doc. 53, Ex. 3).

[20]  "Hot Air" online interview with Marjorie Dannenfelser, March 8, 2010.  (Doc. 53, Ex. 3).

[21]  Article, Christian News Wire, December 6, 2010.  (Doc. 53, Ex. 4).

Accordingly, upon consideration of the four factors and the totality of the
circumstances, this Court is unable to find, as a matter of law, that the statements are
protected opinions.

### B.    Capable of Defamatory Meaning

First, SBA List claims that the taxpayer funded abortion statements are "not
capable of defamatory meaning" because they are not defamatory *per se*, and the ordered
statement does not "reflect[]injuriously on a person's reputation, or expos[e] a person to
public hatred or contempt, ridicule, shame or disgrace, or affect[] a person adversely in
his or her trade, business or profession." *A&B Abell Elevator Co. v. Columbus/Cent.
Ohio Bldg. & Const.*, 651 N.E.2d 1283, 1289 (S.D. Ohio 1995).

SBA List suggests that the only way it could have hurt Mr. Driehaus's reputation
or harmed him in his professional capacity as a public official was by claiming that he
"engaged in illegal conduct while in office." (Doc. 24, Ex. 1). In support of its argument,
SBA List cites *McKimm v. Ohio Elections Comm'n*, 729 N.E.2d 364 (Ohio 2000), which
held that the "[sic] was capable of defamatory meaning because the cartoon implied the
plaintiff 'committed an illegal act while in office.'" (Doc. 34, Ex. 1 at 19). SBA List
claims that its own "statement that Rep. Driehaus 'voted FOR taxpayer funded abortion'"
is incapable of defamatory meaning because it "does not allege or imply that Rep.
Driehaus engaged in illegal conduct, as the defendant's statement implied in *McKimm*."
*Id.* Additionally, SBA List claims that its ordered statement is incapable of defamatory

-17-

meaning because it was an "innocuous statement" that, unlike the cartoon in *McKimm*, did not imply that the public official committed any illegal conduct, nor did it "reflect on Rep. Driehaus'[s] integrity or suggest dishonest conduct on his part." *Id.* at 23. Although the Court recognizes that committing an illegal act while in office is certainly one way to evidence that Mr. Driehaus was harmed in his official capacity, there is absolutely no authority in *McKimm* that an illegal act is the *only* way to evidence reputational harm.[22]

Second, SBA List made its statements in writing. Under Ohio law, libel "is defined generally as a false written publication, made with some degree of fact, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A&B-Abell Elevator Co., Inc.*, 651 N.E.2d at 1289. There is no rule stating that a public official alleging defamation may not rely on false statements that injure his reputation, expose him to public hatred or contempt, or affect him in his profession as a public servant.

---

[22] Ohio courts have never held that imputation of a crime is the only basis for a defamation claim by a public official. If there were such a rule, it is safe to assume that decisions like *Vail*, *supra*, involving public officials not accused of crimes, would have applied such a rule. Moreover, the out-of-state decisions cited by SBA List do not stand for the propositions for which they are cited. *Tatur v. Solsrud*, 498 N.W.2d 232, 234 (Wisc. 1992), does not hold that a candidate may not use loss of votes to show defamation, only that he may not rely soley on loss of votes. Mr. Driehaus does not claim loss of votes, but rather that lost votes was one indicator of his reputational and professional injury, among others. Similarly, there is no rule that a public offical may never predicate a defamation claim on a false attack on his voting record. *Id.* at 234; *See also Fong v. Merena*, 655 P.2d 875, 876 (Haw. 1982) (an attack on the official's voting record "was reasonably susceptible to a defamatory interpretation"). In this case, unlike the cases cited by SBA List, Defendant has evidenced that the attack on his voting record rises to the level of an injury to his reputation for character and personal integrity. (Doc. 53, Ex. 1 at ¶¶ 17-18).

-18-

Finally, whether a false statement is capable of inflicting injury depends on the totality of the circumstances. Mr. Driehaus maintains that "accusing [him] of ordering Lamar Advertising not to put up the SBA List billboard did further damage to [his] reputation for fairness, honesty, and integrity by making it appear to [his] constituents and fellow members of the community that [he] had abused my power as a public official." (Doc. 53, Ex. 3 at ¶ 18).

Construing the facts in the light most favorable to the non-moving party, the Court finds that the taxpayer funded statements and ordered statement are certainly capable of defamatory meaning.

### C. Whether the Statements are False

Next, SBA List contends that summary judgment should be granted because Mr. Driehaus "cannot demonstrate the statements are false." (Doc. 34, Ex. 1 at 23). A public official must show the allegedly defamatory statements are false in order to prevail on a defamation claim. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986).

To support his position that the statements are false, Mr. Driehaus relies on the fact that the PPACA does not include any provision that appropriates taxpayer funds to pay for abortions. (Doc. 53, Ex. 1 at ¶ 14) (*See also supra* at Section III.A.2.a). Specifically, Mr. Driehaus states:

> "Attached at Tabs 2 and 3 of the Affidavit are two reports issued by
> the Congressional Research Service, the public policy research arm
> of Congress. These reports set forth in detail the funds appropriated
> by the PPACA. Abortion is never mentioned in either report. Again,
> this is because the PPACA does not include any provision that
> appropriates taxpayer funds to pay for abortions. SBA List said
> the PPACA includes taxpayer funding of abortions. That is and
> always has been false."

(*Id.* at ¶ 16). Moreover, Ms. Buchanan's affidavits fail to identify any provision in the

PPACA that appropriates taxpayer funds to pay for abortions. (Doc. 34, Ex. 2 and 3).

It is irrelevant whether an assertion that the PPACA "allows for taxpayer funded

abortion" could have been proven to be true (Doc. 34, Ex. 2 at ¶ 18), because the SBA

List made the far different statement that the PPACA "includes taxpayer funding of

abortion." (Doc. 7, Ex. 1 at 7). This statement has a clear and definite meaning – that

funding is in this law. In fact, SBA List's statement is made even more apparent in Ms.

Buchanan's affidavit where she states that SBA List "inferred" from statements Mr.

Driehaus made before the PPACA was passed that the congressman "understood abortion

funding was contained in the PPACA." (Doc. 34, Ex. 3 at ¶¶ 4 at 2). Ms. Buchanan

claims that this "in part" caused Ms. Dannenfelser to say – six months later, "It is a fact

that Steve Driehaus has voted for a bill that includes taxpayer funding of abortion." *Id.*

However, as Mr. Driehaus points to in his affidavit, "I never stated that the health care

reform bill included any provisions appropriating taxpayer funds to pay for abortions

because, in fact, the bill did not contain any such provisions." (Doc. 53, Ex. 1 at ¶ 16,

at 6).

With respect to the ordered statement, SBA List maintains that the word "ordered" was its characterization of the October 4th letter, but adds: "whether a better or different word or characterization is more appropriate, does not demonstrate a statement is false. Particularly when the statement is one expressing the speakers [sic] judgment based upon underlying facts, as is the case with the statement 'ordered Lamar Companies.'" (Doc. 34, Ex. 1 at 25). This statement in and of itself underscores the importance of discovery in this case. Moreover, Mr. Driehaus declares that the statement is "a complete fabrication":

> SBA List's October 7, 2010 statement also made the factual assertion that I 'ordered Lamar Companies not to put up the billboards until the matter was settled by the" OEC. *Id.* This statement also is false. Lamar Advertising Company ("Lamar Advertising") is the company that was going to erect the planned billboards containing SBA List's false and misleading statements about me. I never ordered Lamar Advertising not to put up the SBA List billboards. I never spoke to anyone employed by or connected with Lamar Advertising about the SBA List billboards. I never issued any written or oral order to anyone employed by or connected with Lamar Advertising about the SBA List billboards. Lamar Advertising agreed not put up the SBA List billboards; that company was never ordered not to put up the SBA List billboards. The statement by SBA List that I "ordered Lamar Companies not to put up the billboards" is a complete fabrication.

(Doc. 53, Ex. 1 at ¶ 10).

This Court clearly cannot grant summary judgment where, at this early stage, the Plaintiff is able to produce significant evidence that the statements are false.

## D.     Actual Malice

As a public figure Mr. Driehaus must prove that SBA List made false statements with "actual malice" in order to prevail on his defamation claim. *N.Y. Times Co. v.*

*Sullivan*, 376 U.S. 254, 279-80 (1964).  SBA List argues that Mr. Driehaus could never

make such a showing because the affidavits that he submitted show there was no actual

malice.  (Doc. 34, Ex. 1 at 26-27).  The Court recognizes that this is not a simple analysis.

*Herbert v. Lando*, 441 U.S. 153 at 170 (1979) (a plaintiff may "rarely be successful in

proving awareness of a falsehood from the mouth of the defendant himself").  However,

"[f]alse speech, even political speech, does not merit constitutional protection if the

speaker knows of the falsehood or recklessly disregards the truth."  *Pestrak v. Ohio*

*Elections Comm'n*, 926 F.2d 573, 577 (6th Cir. 1991).

Mr. Driehaus can evidence "public figure" defamation by: (1) demonstrating that

the alleged defamation was an outright fabrication, or (2) showing that SBA List

purposefully avoided the truth.  Reckless disregard for the truth "is likely to be found

'where a story is fabricated by the defendant, [or] is the product of his imagination."

*A&B-Abell Elevator Co.*, 641 N.E.2d at 1293 (quoting *St. Amant v. Thompson*, 390 U.S.

727, 732 (1968)).  A showing of actual malice may also be premised on evidence

demonstrating that the alleged defamer purposefully avoided or deliberately ignored facts

establishing the falsity of its statements.  *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d

408, 411 (6th Cir. 1991).  Mr. Driehaus may prove SBA List's state of mind using

circumstantial evidence, and motive may bear on the actual malice inquiry.  *Harte-Hanks*

*Comm'ns v. Connaughton*, 491 U.S. 657, 667 (1989).  Objective circumstantial evidence

can suffice to demonstrate actual malice and can even "override defendants' protestations

of good faith and honest belief that the report was true."  *Moore v. Vislosky*, 240

Fed.Appx. 457, 468 (3rd Cir. 2007).

The proper inquiry is whether SBA List acted with actual malice when it asserted that Mr. Driehaus voted for a bill that "includes taxpayer funding of abortion." (Doc. 7, Ex. 1 at 7). The Court finds that there are issues of material fact regarding whether SBA List acted with actual malice based on the following undisputed facts: (1) after the Ohio Elections Commission complaint, SBA List continued to claim that "It is a fact that Steve Driehaus has voted for a bill that includes taxpayer funding of abortion," (Doc. 53, Ex. 1 at ¶¶ 8-9); (2) after the Ohio Elections Commission found probable cause that such a statement was false, the SBA List continued to make the false statements, and said that even if the Ohio Elections Commission were to prevent SBA List from putting up the particular billboards - in other words, even if the OEC finds the statement is false – "we will double down and make sure that our message floods his district. We've got radio ads going out all across his district"[23]; and (3) despite multiple requests to point to a provision in the PPACA that included taxpayer funding of abortions, SBA List refused to do so.[24]

_____

[23] Marjorie Dannenfelser, President of the SBA List speaking on Fox News in the fall of 2010 prior to the election. (Doc. 53, Ex. 3).

[24] Doc. 53, Ex. 3 at ¶ 16 (quoting affidavit of Kristen Day, Doc. 7, Ex. 1 at 8-9). *See also* Doc. 53, Ex. 3 at ¶ 15 (quoting another portion of Kristen Day's Affidavit, recounting prior knowledge of affiant Douglas Johnson and representatives of other pro-life organizations that it would be false to call the then-pending health care reform bill "federal funding of abortion."). If this description is accurate, then the affidavits of Ms. Buchanan and Mr. Johnson are misleading, and the SBA List knew long before October 2010 that it would be inaccurate to say, as Ms. Dannenfelser repeatedly did that month – that the PPACA includes taxpayer funding of abortion. This issue goes directly to actual malice and should be explored in discovery. Ms. Day also recounts how she repeatedly asked the SBA List and other such groups to point to the language in the PPACA that provides funding for abortions - but that they failed to do so. (Doc. 7, Ex. 1 at ¶¶ 3-4).

-23-

SBA List's actual malice is not dispelled by its supposed reliance on the view of other organizations. *See, e.g, Citizens to Save Northland*, 2001 Ohio App. LEXIS 5904 at *7 ("whether or not some other person made factual assertions similar to those made by Northland is irrelevant"). This is particularly relevant since, as SBA List claims, it relied on documents to conclude that "the PPACA allows for taxpayer funded abortion." (Doc. 34, Ex. 1 at 26-27). Various organizations may believe that the PPACA should have been written to eliminate the possibility that if various contingencies were to occur – federal funds might be used to pay for abortions in the future. However, this potential future event has nothing to do with the statement actually made by SBA List, namely that the PPACA includes taxpayer funding of abortion.

With respect to the ordered statement, SBA List admits that it was aware of the October 4th letter and knew there had been an agreement reached that Lamar Advertising would not put up the billboards until the Ohio Elections Commission had made a determination. In her second affidavit, Ms. Buchanan acknowledges that "Lamar did not post the billboards as a direct result of the [October 4th] letter" and that the letter "expressed . . . the agreement reached" not to post the billboards. (Doc. 34, Ex. 3 at ¶¶ 13, 12); (*see also* Doc 28 at 7) (admitting that "Lamar agreed that it would not erect the billboards until the OEC had held a probable cause hearing on the matter"). Despite understanding that the standstill was a direct result of this agreement, SBA List stated that Mr. Driehaus "ordered Lamar Companies not to put up the billboards until the matter was

settled" by the Ohio Elections Commission.[25]  (Doc. 53, Ex. 1 at ¶ 10).

Based on these facts, the Court cannot conclude, as SBA List argues, that this case

presents issues of pure law.  Actual malice is a factual analysis that cannot be determined

without discovery.[26]  *See, e.g., Anderson v. Liberty Lobby*, 477 U.S. at 257 (summary

judgment on actual malice cannot be granted unless "the plaintiff has had a full

opportunity to conduct discovery"); *Church of Scientology Int'l v. Behar*, 238 F.3d 168,

173 (2d Cir. 2001) ("resolution of . . . actual malice inquires typically requires

discovery"); *Parisi v. Daioleslam*, 595 F.Supp.2d 99, 102-108 (D.D.C. 2009) ("Discovery

is needed, then, to determine what defendant knew at the time he made the contested

statements.").

### E.     Punitive Damages

SBA List alleges that summary judgment must be granted as to the predicates for

punitive damages because it believes there is no conceivable way for Mr. Driehaus to

---

[25]  Mr. Driehaus claims that SBA List's admission that it knew that this was an "agreed" standstill constitutes a binding judicial admission and, accordingly, the Court can and should hold, as a matter of law, that SBA List acted with actual malice in fabricating the ordered statement. *St. Amant*, 390 U.S. at 732 (actual malice exists where defendant fabricates a story).

[26]  In the alternative, SBA List requests that this Court limit the scope of Mr. Driehaus' discovery to "knowing falsity, high degree of awareness of probably falsity, and entertainment of serious doubts as to the truth of the statements." (Doc. 58 at 15).  However, as this Court explained *supra*, a "public figure" may evidence defamation by: (1) demonstating that the alleged defamation was an outright fabrication, or (2) showing that SBA List purposefully avoided the truth.  Accordingly, those topics are also appropriate for discovery.  "In a defamation case by a public figure, therefore, the plaintiff must demonstrate that the author 'in fact entertained serious doubts as to the truth of his publication, . . . or acted with a high degree of awareness of . . . probable falsity, or, while suspecting falsity, deliberately avoided taking steps that would have confirmed the suspicion." *Harte-Hanks Commc'ns*, 491 U.S. at 692 ("intent to avoid the truth").

establish actionable defamation, the prerequisite for punitive damages.  As this Court has already determined, it would be premature to hold that Mr. Driehaus cannot establish actual defamation.

## IV.  CONCLUSION

Accordingly, for the reasons stated herein, Plaintiff SBA List's motion for summary judgment on Mr. Driehaus's counterclaim for defamation (Doc. 34) is **DENIED**.

**IT IS SO ORDERED.**

Date:  8/1/11

Timothy S. Black
United States District Judge

-26-