## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| SUSAN B. ANTHONY LIST, | : | |
| | : | Case No.:  1:10-cv-00720 |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| REP. STEVE DRIEHAUS, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF SUSAN B. ANTHONY LIST'S MOTIONS FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT

---

Michael A. Carvin* (D.C. Bar No. 366784)
Yaakov M. Roth (D.C. Bar No. 995090)
JONES DAY
51 Louisiana Avenue, N.W.
Washington D.C. 20001
(202) 879-3939
(202) 626-1700 fax
macarvin@jonesday.com

*admitted *pro hac vice*

David R. Langdon (0067046)
LANGDON LAW LLC
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
(513) 577-7380
(513) 577-7383 fax
dlangdon@langdonlaw.com

Robert A. Destro (0024315)
2312 N. Powhatan Street
Arlington, VA 22205-2116
(202) 905-6064
robertdestro@hotmail.com

*Counsel for Plaintiff Susan B. Anthony List*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iv

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 4

I.      OHIO'S FALSE-STATEMENT LAW DOES NOT PROSCRIBE
"DEFAMATION" OR "FRAUD," AND THEREFORE TRIGGERS
CONSTITUTIONAL SCRUTINY ....................................................................... 4

> After *United States v. Alvarez*, 132 S. Ct. 2537 (2012), the Commission can no longer argue that knowingly false speech is categorically unprotected by the First Amendment, so it instead tries to pigeonhole Ohio's false-statement law into *other* categories of unprotected speech, namely defamation and fraud. That effort fails, because the false-statement law is not limited, on its face, in effect, or in purpose, to defamatory or fraudulent speech.

     A.    The False-Statement Law Is Not Limited on Its Face to Defamation or Fraud ......... 5

> Unless a law is limited on its face to unprotected speech, heightened scrutiny applies. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344 (1995); *Talley v. California*, 362 U.S. 60, 64 (1960). Ohio's law is not so limited.

     B.    Ohio's Law Proscribes Non-Defamatory Speech ...................................................... 6

> Ohio's law sweeps in far more speech than just defamation. *Rickert v. Pub. Disclosure Comm'n*, 168 P.3d 826, 830 (Wash. 2007). It proscribes false *positive* statements; and Ohio also proscribes false statements about *ballot issues*. Even as to negative statements about candidates, defamation must expose the subject to public contempt, not mere political disagreement. *See Sweeney v. Beacon Journal Publ'g Co.*, 35 N.E. 2d 471, 473-74 (Ohio Ct. App. 1941); *Shields v. Booles*, 38 S.W.2d 677, 683 (Ky. 1931); *Manasco v. Walley*, 63 So. 2d 91, 92-94 (Miss. 1953); *Schatz v. Republican State Leadership Comm.*, 777 F. Supp. 2d 181, 187 (D. Me. 2011). Neither *Garrison v. Louisiana*, 379 U.S. 64 (1964), nor *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 577 (6th Cir. 1991), is to the contrary.

     C.    Ohio's Law Also Proscribes Non-Fraudulent Speech ............................................... 9

> Ohio's law also sweeps well beyond just "fraudulent" speech. Fraud exists if a *material* falsity is *successfully* used to obtain another's *money or property*.

-i-

*Illinois ex rel. Madigan v. Telemktg. Assocs., Inc.*, 538 U.S. 600, 620 (2003); *McNally v. United States*, 483 U.S. 350, 356 (1987); *Alvarez*, 132 S. Ct. at 2554 (Breyer, J., concurring in judgment). But Ohio's statute, by contrast, proscribes statements that do *not* cause anyone to change their vote, much less lose tangible property rights. *281 Care Comm. v. Arneson*, 638 F.3d 621, 634 n.2 (8th Cir. 2011). Contrary to the Commission's suggestion, *McIntyre*, 514 U.S. at 349-51, does not hold that Ohio's law permissibly targets fraud; to the contrary, it expressly disclaimed making any judgment about that issue.

D.    Defamation and Fraud Are Unprotected Because They, Unlike False Campaign Speech, Inflict Tortious Personal Harm Historically Vindicated by Courts ................................................................................................................. 12

The reason why defamation and fraud have long been unprotected is that they reflect the state's traditional role of vindicating tangible injuries caused by one private citizen to others. *Alvarez*, 132 S. Ct. at 2545; *id.* at 2554 (Breyer, J., concurring in judgment). False political speech is not a historical tort, however, and rather than vindicating any legally cognizable private injuries, is meant to protect the public at large from lies. That is an untenable purpose under the First Amendment, because the state cannot limit speech heard by its citizens in selecting a government. *Az. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2826 (2011); *281 Care*, 638 F.3d at 635-36.

II.   STRICT SCRUTINY APPLIES, BUT OHIO'S LAW FAILS UNDER ANY LEVEL OF HEIGHTENED SCRUTINY ....................................................... 14

Because Ohio's law proscribes protected speech, it must face constitutional scrutiny. Strict scrutiny is the proper standard of scrutiny here. In all events, Ohio's law fails even under intermediate scrutiny.

A.    Strict Scrutiny Applies Under Both *Alvarez* and Pre-*Alvarez* Law, Because the Ohio Law Is a Content-Based Restriction on Political Speech ......................... 14

Ohio's law is a content-based restriction on political speech, and so triggers strict scrutiny. *281 Care*, 638 F.3d at 636; *Rickert*, 168 P.3d at 828; *McIntyre*, 514 U.S. at 347. In addition, all Justices in *Alvarez* agreed that strict scrutiny would apply to laws proscribing false political speech, like Ohio's. *Alvarez*, 132 S. Ct. at 2544 (plurality); *id.* at 2552 (Breyer, J.); *id.* at 2564 (Alito, J.).

B.    In Any Event, Ohio's False-Statement Law Fails Any Level of Heightened Scrutiny, Three Times Over .................................................................................... 16

Even under intermediate scrutiny, Ohio's law fails to pass muster, because it does not demonstrably advance a substantial state interest and because it proscribes and chills more speech than necessary to meet its objectives.

*1.      The Commission admits that it has no empirical evidence to support its claim that the false-statement law preserves the integrity of elections* ................................................................................. 17

The Commission fails to prove that the law advances electoral "integrity." Such evidence is needed. *Alvarez*, 132 S. Ct. at 2549 (plurality); *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738-39 (2011). Further, there is every reason to doubt that the law has such an effect, because the Commission has no advantage in determining "truth" or in persuading the electorate—and in any event cannot do so, under this scheme, before the election takes place. While the statute may deter some false speech, its design equally deters *truthful* speech.

*2.      As a matter of both law and fact, counterspeech is an effective, less-restrictive means of correcting campaign lies* ................................... 20

The law also fails scrutiny because it burdens more speech than necessary. Integrity of political debate is ensured by counterspeech—whether from the private marketplace of ideas or even "government" counterspeech by a non-coercive truth-declaring entity. *Alvarez*, 132 S. Ct. at 2550 (plurality); *id.* at 2556 (Breyer, J., concurring in judgment). But the false-statement law goes much further, penalizing speech that the Commission determines to be false.

*3.      The false-statement law chills truthful speech, notwithstanding the illusory "limits" identified by the Commission* ....................................... 22

Finally, the law does not allow sufficient breathing room for truthful speech. To the contrary, its supposed limits *exacerbate* its chilling effect. *Alvarez*, 132 S. Ct. at 2555 (Breyer, J., concurring in judgment); *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2346 (2014); *Rickert*, 168 P.3d at 831-32.

III.    THE OHIO LAW IS FACIALLY INVALID, BECAUSE MOST IF NOT ALL OF ITS APPLICATIONS WOULD BE UNCONSTITUTIONAL ................................. 26

Facial invalidation is the proper course here. The law is unconstitutional in *all* its applications. The law cannot be limited to defamatory speech because the statute does not include such a limit. And in any case, SBA's speech was not defamatory, and a substantial number of applications will similarly target protected speech. *Alvarez*, 132 S. Ct. at 2551 (plurality); *Brown*, 131 S. Ct. at 2742; *United States v. Stevens*, 130 S. Ct. 1577, 1592 (2010); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965 (1984).

CONCLUSION .......................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page**

**C**ASES

*281 Care Comm. v. Arneson*,
    638 F.3d 621 (8th Cir. 2011) ...................................................................... *passim*

*281 Care Comm. v. Arneson*,
    No. 08-5215, 2013 U.S. Dist. LEXIS 10044 (D. Minn. Jan. 25, 2013).................................20

*Abrams v. United States*,
    250 U.S. 616 (1919).......................................................................................................1

*Araya v. Deep Dive Media, LLC*,
    966 F. Supp. 2d 582 (W.D.N.C. 2013) ...............................................................12

*Az. Free Enter. Club's Freedom Club PAC v. Bennett*,
    131 S. Ct. 2806 (2011)...............................................................................13, 17

*Brentwood Academy v. Tenn.e Secondary Sch. Athletic Ass'n*,
    262 F.3d 543 (6th Cir. 2001) ...........................................................................22

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)..........................................................................................28

*Brown v. Entm't Merchants Ass'n*,
    131 S. Ct. 2729 (2011)................................................................................18, 26

*Brown v. Hartlage*,
    456 U.S. 45 (1982)............................................................................................21

*Buckley v. Valeo*,
    424 U.S. 1 (1976).......................................................................................13, 24

*Burson v. Freeman*,
    504 U.S. 191 (1992)..........................................................................................17

*Cantwell v. Connecticut*,
    310 U.S. 296 (1940)..........................................................................................23

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980)..........................................................................................17

*Citizens United v. FEC*,
    558 U.S. 310 (2010)..................................................................................13, 18, 25

*Connection Distrib. Co. v. Holder*,
    557 F.3d 321 (6th Cir. 2009) (en banc) ...........................................................28

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)..........................................................................................17

*Edenfield v. Fane*,
    507 U.S. 761 (1993)..........................................................................................18

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989)..........................................................................................17

*FEC v. Wis. Right to Life, Inc.*,
    551 U.S. 449 (2007)..........................................................................................13

*Frinzi v. Hanson*,
    140 N.W.2d 259 (Wis. 1966).............................................................................7

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)......................................................................................1, 8, 9

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)..........................................................................................21

*Hein v. Lacy*,
    616 P.2d 277 (Kan. 1980).................................................................................7

*Illinois ex rel. Madigan v. Telemktg. Assocs., Inc.*,
    538 U.S. 600 (2003)..........................................................................................10

*Manasco v. Walley*,
    63 So. 2d 91 (Miss. 1953).................................................................................7

*Marks v. United States*,
    430 U.S. 188 (1977)..........................................................................................14

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)............................................................................... *passim*

*McNally v. United States*,
    483 U.S. 350 (1987)..........................................................................................10

*Mills v. Alabama*,
384 U.S. 214 (1966)................................................................................13

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)........................................................................8, 9, 15

*New York v. Ferber*,
458 U.S. 747 (1982)..........................................................................27, 28

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000)................................................................................19

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ...............................................................24

*Pestrak v. Ohio Elections Comm'n*,
926 F.2d 573 (6th Cir. 1991) ........................................1, 2, 8, 9, 22

*Reno v. Am. Civil Liberties Union*,
521 U.S. 844 (1997)................................................................................27

*Rickert v. Pub. Disclosure Comm'n*,
168 P.3d 826 (Wash. 2007)...........................................................*passim*

*Schatz v. Republican State Leadership Comm.*,
777 F. Supp. 2d 181 (D. Me. 2011) ..........................................................7

*Scheidler v. Nat'l Org. for Women, Inc.*,
537 U.S. 393 (2003)................................................................................10

*Secretary of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984)................................................................................28

*Shields v. Booles*,
738 S.W.2d 677 (Ky. 1931) .......................................................................7

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011)............................................................................26

*Speet v. Schuette*,
726 F.3d 867 (6th Cir. 2013) ..................................................................28

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334 (2014)..................................................................*passim*

*Sweeney v. Beacon Journal Pub'g Co.*,
735 N.E. 2d 471 (Ohio Ct. App. 1941) ................................................................7

*Talley v. California*,
362 U.S. 60 (1960) ................................................................................................5

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ............................................................................................16

*United States v. Alvarez*,
132 S. Ct. 2537 (2012) ................................................................................*passim*

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) ............................................................................................14

*United States v. Stevens*,
130 S. Ct. 1577 (2010) ........................................................................................27

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) ............................................................................................27

**STATUTES AND REGULATIONS**

Ohio Admin. Code § 3517-01-04(A) ..............................................................................22

Ohio Rev. Code Ann. § 3517.153(B) .............................................................................22

Ohio Rev. Code Ann. § 3517.21(B)(9) .....................................................................6, 29

Ohio Rev. Code Ann. § 3517.21(B)(10) ..................................................................24, 29

Ohio Rev. Code Ann. § 3517.22(B)(2) ...........................................................................6

Ohio Rev. Code Ann. § 3517.992(V) ............................................................................22

Ohio Rev. Code Ann. § 3599.39 ...................................................................................22

**OTHER AUTHORITIES**

Charles Fried, *The New First Amendment Jurisprudence: A Threat to Liberty*,
59 U. CHI. L. REV. 225, 238 (1992) ................................................................12

## INTRODUCTION

The Commission opens its opposition brief by lamenting that "lies can and do influence voters and affect elections." (Opp. 1.) The question presented in this case, however, is how our society should combat that problem—through robust political debate and competition in the free marketplace of ideas, or through state criminalization of "falsity" as determined by a politically appointed Ministry of Truth? The Constitution itself answers that question. As Justice Oliver Wendell Holmes expressed nearly a century ago, "the best test of truth is the power of the thought to get itself accepted in the competition of the market. … That at any rate is the theory of our Constitution." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). *United States v. Alvarez* echoed that thought: "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." 132 S. Ct. 2537, 2547 (2012) (plurality). And this Court, too, articulated the same "fundamental principle" in rejecting Rep. Steve Driehaus's defamation claim in this case: "Who then shall be the arbiter of political truth? Ultimately, in a free society, the truth of political back and forth must be adjudicated in the 'marketplace of ideas,' in the context of the 'uninhibited, robust, and wide-open' debate on 'public issues' that the First Amendment protects." (Order, Dkt. 108, at 3 (citations omitted).)

Before *Alvarez*, some courts overread earlier Supreme Court dicta, such as in *Garrison v. Louisiana*, 379 U.S. 64 (1964), as rendering knowingly false speech categorically unprotected. On that view, the Sixth Circuit upheld Ohio's false-statement law against facial attack. *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 577 (6th Cir. 1991) (citing *Garrison* as holding that "false speech, even political speech, does not merit constitutional protection"). But *Alvarez* clarified that the Court had "never endorsed [that] categorical rule." 132 S. Ct. at 2545 (plurality). To the contrary, *Alvarez* invalidated a law proscribing knowing, verifiable lies, even *outside* the highly protected political context. *Pestrak*'s premise has thus been squarely rejected.

Indeed, in light of the superseding *Alvarez* precedent, the Commission cannot and does not deny that, contrary to *Pestrak*, knowing falsity alone does not strip speech of constitutional protection.  *Pestrak* therefore concededly does not control in this case.  Rather, the Commission attempts to save its law, and to distinguish *Alvarez*, on three other grounds.  All are meritless, however—foreclosed not only by *Alvarez* but also by basic First Amendment principles.

*First*, the Commission tries to take refuge in two narrow, historically rooted exceptions to First Amendment protection—defamation and fraud—contending that the false-statement law is somehow limited to those acts and thus warrants *no* constitutional scrutiny.  But as both the *Alvarez* plurality and concurring opinions explained, defamation and fraud have been historically penalized because they constitute "tortious wrongs" that impose "legally cognizable harm," *i.e.*, "tangible" monetary or personal harm to "identifiable victims."  132 S. Ct. at 2545 (plurality); *id.* at 2554 (Breyer, J.).  By contrast, Ohio's false-statement law is designed not to prevent any such personal, cognizable injury, but rather to "protect its voters" from being deceived by political lies (Opp. 1)—a vastly different purpose, one that is contrary to constitutional norms and has no limiting principle.  Nor is the false-statement law, on its face or in effect, limited to proscribing "defamatory" speech or "fraud."  Indeed, if the law were so limited, it would be superfluous and redundant, because Ohio *independently* forbids defamation and fraud.  In reality, Ohio's election laws proscribe statements that are *not* defamatory—including, *e.g.*, false statements that *promote* a candidate, false statements about *ballot initiatives*, and statements like SBA's here, which this Court has already held to be false but not defamatory.  Ohio's laws also proscribe statements that are *not* fraudulent—because they induce no reliance, cause no damage, and result in no material gain.  Thus, while it is true that knowingly false defamatory speech and fraud are not entitled to constitutional protection, those exceptions are simply irrelevant here.

*Second*, the Commission argues that, at most, intermediate scrutiny applies, and that the law can survive such scrutiny. It is wrong on both fronts. *All* the Justices in *Alvarez*, including Justice Breyer (concurring) and even Justice Alito (in dissent), agreed that strict scrutiny would be the applicable standard for a law proscribing false *political* speech, as Ohio's law clearly is. And, even before *Alvarez*, it was clear that strict scrutiny applies to content-based restrictions on political speech, as the Eighth Circuit ruled in considering Minnesota's analogous law. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 633-34 (8th Cir. 2011). Regardless, Ohio's law fails any form of heightened scrutiny. While Ohio may have a legitimate interest in protecting electoral "integrity," it *admits* that it cannot prove through any empirical evidence that the false-statement law actually advances that interest—which alone dooms the law. This evidentiary void is hardly surprising, since there is not even a plausible basis for *assuming* that the law materially advances "truth" in electoral campaigns. That is especially true because the Commission is almost never able to rule on false-statement complaints before the elections occur—instead issuing "probable cause" findings that further *mislead* voters, as Ohio's Attorney General has explained. In any event, because counterspeech in the political marketplace of ideas was a "less-restrictive means" in *Alvarez*, it surely suffices here, given the much greater attention that political statements draw from adversaries as well as independent observers and media. And if Ohio insists that only its Ministry of Truth is sufficiently impartial to judge truth, that Ministry may continue to issue its pronouncements—but that is no excuse for burdening or penalizing those whom it brands as liars. Finally, Ohio's law chills *truthful* speech. The supposed "procedural safeguards" touted by the Commission actually *exacerbate* its chilling effect, for numerous reasons explained at length by the Attorney General himself yet that the Commission ignores. And the other "limits" identified by the Commission are similarly illusory, as this case so well illustrates.

*Third*, the Commission contends that *facial* relief is improper here.  That, too, is wrong.  Because the Ohio law is constitutionally defective in all of its applications—or, at the very least, in a substantial number, and thus overbroad—it cannot survive at all.

## ARGUMENT

The Commission does not contend that, if the false-statement law is unconstitutional, the irreparable harm or equitable factors should preclude injunctive relief.  Thus, there is a single, discrete legal question that resolves both of SBA's pending motions: Can Ohio's false-statement law, on its face, be squared with the First Amendment?  As explained below, it cannot.

## I.    OHIO'S FALSE-STATEMENT LAW DOES NOT PROSCRIBE "DEFAMATION" OR "FRAUD," AND THEREFORE TRIGGERS CONSTITUTIONAL SCRUTINY.

The Commission recognizes, as it must, that after the Supreme Court's *Alvarez* decision, it cannot argue that false speech (even knowingly false speech) is categorically unprotected by the First Amendment.  Indeed, *none* of the Justices in *Alvarez* accepted that categorical rule.  *See* 132 S. Ct. at 2546-47 (plurality) (rejecting "notion that false speech should be in a general category that is presumptively unprotected"); *id.* at 2553 (Breyer, J., concurring in judgment) (observing that prohibiting falsity "can inhibit the speaker from making true statements," and thus falsity cannot receive "no protection at all"); *id.* at 2564 (Alito, J., dissenting) (recognizing "broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech").  And if the speech proscribed by the Stolen Valor Act was protected, even though it encompassed only a narrow set of objectively verifiable lies that had no apparent social value and posed no risk of chilling any truthful speech, then *core political speech in the middle of an election campaign* must surely be protected.  Such speech is at the heart of the First Amendment; criminalizing it risks chilling a broad swath of highly valuable political debate, including truthful speech.

4

Recognizing this fatal flaw, the Commission does not claim that knowingly false political speech is unprotected. Instead, it (correctly) notes that *other* "categories of speech"—namely, knowingly false defamation and fraud—are not constitutionally protected, and then (incorrectly) claims that the false-statement law targets only such unprotected speech. (Opp. 11.) SBA agrees that those narrow categories of speech are unprotected—as *Alvarez* itself reiterated, 132 S. Ct. at 2544 (plurality). But neither is relevant here. Ohio's false-statement law encompasses, on its face and in effect, speech that is neither defamatory nor fraudulent—which is why Ohio enacted a distinct law in the first place. This statute is constitutionally deficient because it extends far beyond vindicating the legally cognizable, personal harms that tort law has historically addressed.

**A.     The False-Statement Law Is Not Limited on Its Face to Defamation or Fraud.**

While the Commission vaguely says that the false-statement law "implicates" fraud and defamation (Opp. 11), it is clear from Supreme Court precedent that unless a law is limited *on its face* to categories of unprotected speech, constitutional scrutiny cannot be evaded. Indeed, the Court so held in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), on which the Commission repeatedly relies. There, the Commission sought to defend another of its laws (the prohibition on anonymous campaign leafleting) using a similar argument—that it was a measure to stop "falsity or libel." *Id.* at 344. The Court rejected that defense, because the law "contains no language limiting its application to fraudulent, false, or libelous statements." *Id.*; *see also Talley v. California*, 362 U.S. 60, 64 (1960) (rejecting argument that ordinance targets "fraud, false advertising and libel" because its text "is in no manner so limited"). The argument fares no better here. Ohio's false-statement law "contains no language limiting its application" to false statements that are "defamatory" or that actually "defraud" anyone. *McIntyre*, 514 U.S. at 344. The Commission therefore cannot insulate the law from review by asserting that it is aimed at those unprotected categories. Indeed, as shown below, the statute stretches far beyond them.

### B.     Ohio's Law Proscribes Non-Defamatory Speech.

As to defamation, the Commission admits that a statement must be not only false but also *defamatory* to fall within that unprotected category.  But it claims that Ohio's law captures only such legally defamatory speech.  (Opp. 15-16.)  That is wrong for two reasons.

*First*, Ohio's law is not limited to "negative" statements to "defeat" a candidate.  (Opp. 15-16.)  Rather, it proscribes *any* "false statement … to promote the election … or defeat of the candidate" or "concerning" one's "voting record."  Ohio Rev. Code Ann. § 3517.21(B)(9), (10). Thus, a speaker who claims that his *preferred* candidate "will create one million new jobs," or "always opposed abortion," or "supports our troops," or "voted against that bill," could be the target of proceedings by anyone who disputes those statements.  Of course, none of those claims is *defamatory*; they are *positive* claims to *promote* the candidate.  They nonetheless fall within the law, proving that it does not target only unprotected defamation.  Further confirming that, Ohio election laws—in the very next section—prohibit false statements to "promote the adoption or defeat of any *ballot proposition or issue*."  Ohio Rev. Code Ann. § 3517.22(B)(2).  The fact that Ohio also prohibits false statements about *ballot issues*—which clearly cannot be defamed— belies its claim that defamation is its target.  *281 Care*, 638 F.3d at 634 (rejecting defamation analogy because "ballot initiative clearly cannot be the victim of a character assassination").

*Second*, even as to negative claims designed to defeat a candidate, it is simply not true that such claims are necessarily "defamatory" if false.  *See Rickert v. Pub. Disclosure Comm'n*, 168 P.3d 826, 830 (Wash. 2007) (invalidating analogous statute because it had "no requirement that the statements subject to sanction" be "defamatory"). In the political context, courts (in Ohio and elsewhere) reject the theory that any statement that could cause *electoral harm* is inherently defamatory.  Rather, as this Court has recognized, so blurring the line between political disputes and exposure to contempt would unduly insert the judiciary into every political campaign.

6

As the court explained in *Sweeney v. Beacon Journal Publishing Co.*, a statement dealing "entirely with the activities of a public officer in his connection with a matter entirely political in character" is not libelous; such a statement does not "impute" to the plaintiff a "violation of the moral code or the laws of the land." 35 N.E. 2d 471, 473-74 (Ohio Ct. App. 1941). Thus, the vast majority of statements proscribed by Ohio's law—addressing a candidate's acts "entirely political in character"—would *not* be defamatory in Ohio. *Id.* And other states have adopted the same rule. In *Shields v. Booles*, the defendant falsely told voters that the plaintiff "had voted against a repeal of the pari-mutuel law, and in favor of race-track gambling." 38 S.W.2d 677, 678 (Ky. 1931). The court rejected the defamation suit: stating "incorrectly how a representative had voted" does not "imply immoral, indecent, or other culpable conduct falling within any classification of publications deemed defamatory." *Id.* at 683. Similarly, in *Manasco v. Walley*, the defendant falsely stated that a legislator had removed certain highway projects from a "priority list." 63 So. 2d 91, 92-93 (Miss. 1953). That was not defamatory, because it did not "reflec[t] upon [the plaintiff's] honesty, integrity, or moral character." *Id.* at 94. And, in *Hein v. Lacy*, a brochure about "the voting record and views of the plaintiff in his capacity as a Kansas state senator" was not actionable, since it was not "an attack on [his] personal integrity or character," but only on his political "views and voting record." 616 P.2d 277, 284 (Kan. 1980). Importantly, none of these courts cared that all these statements were presumably made to cause electoral harm to the plaintiffs. That is because, even if statements "could affect some people's decision on whether to vote for [the plaintiff], … that is not the test of defamation." *Schatz v. Republican State Leadership Comm.*, 777 F. Supp. 2d 181, 187 (D. Me. 2011); *see also Frinzi v. Hanson*, 140 N.W.2d 259, 262 (Wis. 1966) (rejecting defamation claim even though "statement would cause some Democrats not to vote for Frinzi," because it was still "not libelous").

7

Indeed, this case is a perfect illustration of how statements made to defeat a candidate are not necessarily defamatory, even if "false" and even if subjected to false-statement proceedings. This Court ruled that SBA's statements about Rep. Driehaus's vote for the Affordable Care Act were factually false. (Order, Dkt. 66, at 20-21.) And the OEC, of course, found probable cause that the statements violated the false-statement law. (Dkt. 25-5, at 30.) Yet the Court found the statements not defamatory, because "associating a political candidate with a mainstream political position, even if false, cannot constitute defamation, as a matter of law." (Order, Dkt. 108, at 3.) As this Court noted, that rule ensures that courts do not serve as "truth squads" for "core political speech on matters of public concern," which would be constitutionally anathema. (*Id.* at 5.)

Although the false-statement law thus clearly extends well beyond defamatory speech, the Commission insists otherwise, relying on two cases—the Supreme Court's *Garrison* decision and the Sixth Circuit's *Pestrak* decision. (Opp. 13-15.) The Commission misunderstands both. *Garrison* invalidated Louisiana's criminal defamation law, which the Court found "incorporate[d] constitutionally invalid standards in the context of criticism of the official conduct of public officials." 379 U.S. at 77. In particular, the law proscribed true statements, as well as false ones made without knowledge or reckless disregard of their falsity. *Id.* at 78. The decision thus simply reaffirmed the rule that even *defamatory* speech cannot be proscribed unless made with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Since the problem here is that Ohio outlaws speech that is *not defamatory*, that case does not help it.

To be sure, *Garrison* also included overbroad dicta suggesting that "knowingly false statement[s] … do not enjoy constitutional protection" at all. 379 U.S. at 75. The Sixth Circuit, in *Pestrak*, cited that dicta to hold that "false speech … does not merit constitutional protection if the speaker knows of the falsehood," and therefore that Ohio's false-statement law "is directed

against … speech that is not constitutionally protected." 926 F.2d at 577. In *Alvarez*, however, the Supreme Court clarified that its *Garrison* dicta, along with dicta from other cases, "all derive from cases discussing defamation, fraud, or some other legally cognizable harm associated with a false statement"; that such dicta cannot be imported from the defamation context to other, "far greater realm[s] of discourse and expression"; and that there is accordingly no "categorical rule" that knowingly false speech is unprotected. 132 S. Ct. at 2545 (plurality). The central premise of *Pestrak*—namely, the *Garrison* dicta—was therefore directly rejected by *Alvarez*.

The Commission misleadingly suggests that *Pestrak* found that Ohio's law "fall[s] within the confines of defamation." (Opp. 14.) Not true. *Pestrak* held that Ohio's law "come[s] within the Supreme Court holdings in" *Garrison* and *N.Y. Times*, which "indicate that false speech, even political speech, does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth." *Pestrak*, 926 F.2d at 577. That is, *Pestrak* held that the speech proscribed by Ohio's statute is unprotected because it is knowingly *false*, not because it is *defamatory*. And, as already explained, *Pestrak*'s actual theory was rejected by *Alvarez*.

### C.    Ohio's Law Also Proscribes Non-Fraudulent Speech.

The Commission also argues that the false-statement law proscribes "fraudulent" speech, and thus (because fraud is not constitutionally protected) evades constitutional scrutiny. (Opp. 18-19.) Once again, however, the Commission mischaracterizes the statute.

For one thing, not every falsehood meant to induce action is automatically "fraudulent." In permitting Illinois to subject misleading fundraisers to fraud liability, the Supreme Court clarified that a "[f]alse statement alone does not subject a fundraiser to fraud liability"; rather, "the complainant must show that the defendant made a false representation of a *material* fact knowing that the representation was false; further, the complainant must demonstrate that the defendant made the representation with the intent to mislead the listener, and *succeeded* in doing

9

so." *Illinois ex rel. Madigan v. Telemktg. Assocs., Inc.*, 538 U.S. 600, 620 (2003) (emphasis added). Only those "[e]xacting proof requirements" provided "sufficient breathing room for protected speech." *Id. Accord Alvarez*, 132 S. Ct. at 2554 (Breyer, J., concurring in judgment) ("Fraud statutes … typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury."). Here, by contrast, Ohio's statute applies to *any* false statement about a candidate that is meant to promote that candidate's election or defeat— which is the intent of *all* statements during campaigns, and thus no limit at all. Nothing in the law restricts it to "material" falsehoods or those that "succeeded" in misleading voters or causing electoral harm. The Eighth Circuit thus rejected this same "fraud" argument when invoked to defend Minnesota's ban on false campaign statements, reasoning that "the Supreme Court has carefully limited the boundaries of what is considered fraudulent speech" and "has not included all false speech, or even all knowingly false speech." *281 Care*, 638 F.3d at 634 n.2.

Moreover, regardless of the formal elements of fraud, the concept cannot be imported so readily from a *monetary* context to a *political* one. Laws against fraud "protect the people from schemes to deprive them of their *money or property*." *McNally v. United States*, 483 U.S. 350, 356 (1987) (emphasis added). Historically, fraud occurs when one is wronged "in his property rights." *Id.* at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). By contrast, schemes that deprive people of intangible *political* rights, like the "right of the citizenry to good government," are not fraudulent within that term's common-law meaning. *Id.* at 356. Thus, falsehoods that deceive listeners about *whom to vote for* are not "fraudulent," because they are not designed to obtain the money or property of listeners—only their electoral allegiance. *Cf. Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 402 (2003) (efforts to shut down abortion clinics were not attempts to "obtain[]" property rights, and so did not constitute extortion).

10

Indeed, as *Alvarez* confirms, drawing a rough analogy to falsehoods that cause traditional monetary harms is not sufficient to deprive false speech of constitutional protection. In *Alvarez*, Justice Breyer recognized that the "closest analogy" to the law forbidding false claims to have been awarded military honors were laws "prohibiting trademark infringement." 132 S. Ct. at 2554 (Breyer, J., concurring in judgment). "[A] false claim of possession of a medal or other honor creates confusion about who is entitled to wear it, thus diluting its value to those who have earned it, to their families, and to their country." *Id.* And Justice Alito urged the Stolen Valor Act be upheld on this analogy. *See id.* at 2559 (Alito, J., dissenting). Yet the Court rejected the argument, seeing a fundamental difference between a trademark law that vindicates traditional "commercial" injury to identifiable trademark holders, *id.* at 2554 (Breyer, J.), versus intangible harms supposedly inflicted on the country at large by false claims of military honors. In much the same way, a fraudster's theft of money or property through deception cannot be compared to a candidate's "theft" of votes through statements that the Commission deems false.

The Commission rests its "fraud" argument almost exclusively on the Supreme Court's *McIntyre* decision, which invalidated Ohio's law prohibiting anonymous political leafleting. 514 U.S. at 357. The Court noted that Ohio's attempt to defend that law as a means of preventing "fraud" was belied by the fact that Ohio already independently forbids "false statements during political campaigns." *Id.* at 349. "Thus, Ohio's prohibition of anonymous leaflets plainly is not its principal weapon against fraud." *Id.* at 350. In other words, the identity-disclosure rule was not necessary, because Ohio targeted what it called "fraud" *directly*. But the Court clarified that it was *not* there "evaluat[ing] the constitutionality of these [false-statement] provisions." *Id.* at 349 n.12. So the Commission cannot rely on *McIntyre* to support the plainly wrong notion that the false-statement law is somehow limited to unprotected "fraudulent" speech.

11

### D. Defamation and Fraud Are Unprotected Since They, Unlike False Campaign Speech, Inflict Tortious Personal Harm Historically Vindicated by Courts.

Stepping back from the technical elements of defamation and fraud, these traditional torts fundamentally differ in purpose from Ohio's law here. And this distinction illustrates why the latter statute raises constitutional concerns that the former causes of action do not.

As *Alvarez* explained, defamation and fraud are "legally cognizable harm[s] *associated with* a false statement." 132 S. Ct. at 2545 (plurality) (emphasis added). The "law permits recovery for [such] tortious wrongs," *id.*, by targeting, not speech itself, but rather the "tangible harm"—monetary injuries—caused to "identifiable victims" by that speech. *Id.* at 2554 (Breyer, J., concurring in judgment). And each has a historical pedigree of *not* receiving constitutional protection. *Id.* at 2544 (plurality). Fraud and defamation are thus longstanding torts consistent with the state's traditional role of protecting one citizen against tangible economic harm by another. That role does not disappear just because the theft or reputational injury is implemented through *words*, not conduct. *See Araya v. Deep Dive Media, LLC*, 966 F. Supp. 2d 582, 593-94 (W.D.N.C. 2013) (falsehoods "that harm a plaintiff in a tortious way … are not protected").

By contrast, Ohio's law serves an entirely different purpose. It does not target traditional, "legally cognizable" harms, *see Rickert*, 168 P.3d at 830 (Washington false-statement law had "no mechanism for compensation for damage to reputations"), but rather is meant "[t]o protect voters" from being swayed by lies (Opp. 1). That is, the state interest here is not protecting citizens from personal injuries, but rather paternalistically protecting the citizenry at large from "untruths" that state bureaucrats—but, supposedly, not the ignorant public itself—can identify. *Cf.* Charles Fried, *The New First Amendment Jurisprudence: A Threat to Liberty*, 59 U. Chi. L. Rev. 225, 238 (1992) (traditional defamation "vindicate[s] private rights," but "First Amendment precludes punishment for generalized 'public' frauds, deceptions, and defamation").

Not only is that purpose unsupported by any historical lineage, it is contrary to the basic principle that the state has *no* right to limit the speech available to the public when selecting a government.  "[S]uch basic intrusion by the government into the debate over who should govern goes to the heart of First Amendment values."  *Az. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2826 (2011); *see also 281 Care*, 638 F.3d at 635-36 ("This law puts the Minnesota state government in the unseemly position of being the arbiter of truth about political speech."); *Rickert*, 168 P.3d at 829; Fried, *supra*, at 239 ("[I]n the public domain the state is enforcing a view of the truth about itself.  Because it is interested, it cannot be trusted.").  Ohio's law is especially indefensible because the *only* people it protects are precisely those about whom speech should *never* be limited—elected officials and candidates.  After all, "debate on the qualifications of candidates [is] integral to the operation of [our] system of government." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam); *see also Mills v. Alabama*, 384 U.S. 214, 218 (1966) (recognizing "practically universal agreement that a major purpose of" First Amendment "was to protect the free discussion of governmental affairs," such as "discussions of candidates").

Finally, the state cannot impose costly burdens on citizens speaking about politics, as that chills vital speech.  *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 468 n.5 (2007) ("[L]itigation constitutes a severe burden on political speech."); *Citizens United v. FEC*, 558 U.S. 310, 337-38 (2010).  Yet, as the Supreme Court recognized here, Ohio's law does just that, forcing speakers to face "burdensome Commission proceedings" and "divert significant time and resources … in the crucial days leading up to an election."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2346 (2014) ("*SBA*").  Thus, both the *ends* and the *means* of Ohio's false-statement law are at war with the First Amendment: The law impermissibly seeks to censor the electoral marketplace, and does so in a way that inherently chills both true and false contributions thereto.

13

## II.     STRICT SCRUTINY APPLIES, BUT OHIO'S LAW FAILS UNDER ANY LEVEL OF HEIGHTENED SCRUTINY.

As an alternative argument, the Commission contends that Ohio's false-statement law can survive heightened constitutional scrutiny.  (Opp. 19.)  It cannot.  The Commission errs both in identifying the proper level of scrutiny and in applying that scrutiny.  Under *Alvarez*—and even under pre-*Alvarez* law—strict scrutiny applies to Ohio's content-based restriction on political speech.  The level of scrutiny is not dispositive here, however, because under *any* heightened level of review, the statute fails for multiple independent reasons.

### A.     Strict Scrutiny Applies Under Both *Alvarez* and Pre-*Alvarez* Law, Because the Ohio Law Is a Content-Based Restriction on Political Speech.

The Commission argues that Justice Breyer's concurrence in *Alvarez* is narrower than the plurality opinion, and therefore that his opinion commands precedential authority under the rule of *Marks v. United States*, 430 U.S. 188 (1977).  According to the Commission, Justice Breyer's concurrence calls for application of "intermediate scrutiny" here.  (Opp. 20-21.)  This argument fails, because even under pre-*Alvarez* law it is clear that strict scrutiny governs here.  And, in fact, Justice Breyer's *Alvarez* concurrence agrees with the plurality—as does Justice Alito's dissent, for that matter—that strict scrutiny applies to restrictions (like Ohio's) on core *political* speech.

**1.**     Even setting *Alvarez* aside, prior law confirms that strict scrutiny governs.  Before *Alvarez*, the Eighth Circuit held—citing the "general rule" that "content-based speech restrictions can only stand if they meet the demands of strict scrutiny"—that a ban on false campaign speech could survive only if "narrowly tailored to meet a compelling government interest."  *281 Care*, 638 F.3d at 633, 636.  Ohio's law is certainly content-based—it applies only to certain speech about *candidates*—and thus is subject to that rule too.  *Rickert*, 168 P.3d at 828 (applying strict scrutiny to Washington false-statement law); *see also United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (general rule that content-based restrictions subject to strict scrutiny).

14

That Ohio's law targets *political* speech only corroborates that result. *Rickert*, 168 P.3d at 828. As the Supreme Court reiterated in *McIntyre*, political speech "occupies the core of the protection afforded by the First Amendment"; "[n]o form of speech is entitled to greater constitutional protection." 514 U.S. at 346-47. "When a law burdens core political speech, … we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347. Indeed, *McIntyre* applied that "strictest standard of review," *id.* at 348, even though the restriction there—which prohibited anonymous leaflets—was in effect just a *disclosure* rule. The same "strictest standard" therefore must apply, *a fortiori*, to content-based criminalizations of certain political statements—the most straightforward and direct type of speech suppression.

**2.** It is true that Justice Breyer, in *Alvarez*, applied "intermediate scrutiny." 132 S. Ct. at 2552 (Breyer, J., concurring in judgment). But he also agreed that "[l]aws restricting false statements about philosophy, religion, history, the social sciences, the arts, and the like raise [concerns about suppressing truthful speech], and in many contexts have called for strict scrutiny." *Id.* The key distinction, for him, was that the Stolen Valor Act was not "such a law," because it was limited to "false statements about easily verifiable facts that do not concern such subject matter" and do not "make a valuable contribution to the marketplace of ideas." *Id.*

Ohio's false-statement law is plainly distinguishable from the Stolen Valor Act in those respects. It concerns political speech at the heart of the First Amendment—a subject matter where even *false* speech contributes in an important way to public debate, as Justice Breyer recognized by quoting *New York Times Co. v. Sullivan*. *See* 376 U.S. at 279 n.19 ("Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collusion with error.'" (citation omitted)). And Ohio's law, unlike the Stolen Valor Act, substantially chills truthful

speech, not only because of its broad scope and political context but also in light of its practical procedural operation—as SBA and even Ohio's own Attorney General have explained at length. (*See* SBA PI Mem., Dkt. 120, at 4-5, 16-18.) Thus, consistent with earlier decisions like *McIntyre* and with the Eighth Circuit in *281 Care*, Justice Breyer's concurrence actually calls for application of *strict* scrutiny in this case.

So does Justice Alito's dissent. He acknowledged "broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech." *Alvarez*, 132 S. Ct. at 2564 (Alito, J., dissenting). "Laws restricting false statements about … matters of public concern would present such a threat," and it would thus be "perilous to permit the state to be the arbiter of truth" in that area. *Id.* Further, "[a]llowing the state to proscribe false statements in these areas also opens the door for the state to use its power for political ends," creating a "potential for abuse of power … simply too great" for the First Amendment to permit. *Id.* Of course, Ohio's false-statement law is precisely such a statute. There is thus no real dispute that strict scrutiny is the proper level of review in this case.

**B.**      **In Any Event, Ohio's False-Statement Law Fails Any Level of Heightened Scrutiny, Three Times Over.**

Even if intermediate scrutiny applies here, Ohio's law fails that review. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (intermediate scrutiny requires "substantial" interest, and that burdens on speech "no greater than is essential" (citations omitted)). The Commission does not even *try* to prove that the law advances its interests in preserving electoral "integrity"— and for good reason: it clearly does not. Moreover, the Commission denies that counterspeech would be an effective, less-restrictive means of combating campaign lies, but *Alvarez* held just that in a case where counterspeech is *less* reliable. And while the Commission touts the law's "procedural safeguards," Ohio's own Attorney General says they *exacerbate* its chilling effect.

### 1. The Commission admits that it has no empirical evidence to support its claim that the false-statement law preserves the integrity of elections.

According to the Commission, the interest served by its false-statement law is "protecting the integrity of its elections." (Opp. 21.) At the outset, the Supreme Court precedents on which the Commission relies to defend that "compelling interest" are plainly distinguishable. Of course the state may ensure that only eligible voters cast ballots—to prevent "voter fraud." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality). And it may also restrict ballot access, to ensure that only candidates with some support are listed. *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). In other words, the state may regulate electoral *mechanics* to ensure "order and fairness" in the *process*. *Id.* at 232. But that is a far cry from regulating electoral *speech* in an effort to ensure "fairness" in political *debate*. The latter is flatly impermissible. *Az. Free Enter. Club*, 131 S. Ct. at 2826 ("The First Amendment embodies our choice as a Nation that, when it comes to such [campaign] speech, the guiding principle is freedom … not whatever the State may view as fair."); *Rickert*, 168 P.3d at 831 (rejecting this state interest as "conflict[ing] with the fundamental principles of the First Amendment").[1]

As for *McIntyre*, the Court there did not describe the state interest in preventing false speech as "compelling" or even "substantial," saying only that it is "legitimate" and has "special weight during election campaigns." 514 U.S. at 349, 351. In addition, as noted above, the Court expressly *declined* to address the constitutionality of any law proscribing false campaign speech,

---

[1] The Commission also cites *Burson v. Freeman*, 504 U.S. 191 (1992), but the issue there was whether the state could prohibit campaign solicitations in close proximity to polling places. The basis for that prohibition was that the *location* of the speech—not its content—would (as it historically had) invite voter intimidation and electoral fraud. *Id.* at 198-206. Those concerns are absent here; the Commission's only fear is that voters will be *persuaded* by "false" speech. That, by contrast to *Burson*, has never been upheld as a compelling or substantial state interest. To the contrary, "[i]f the First Amendment guarantee means anything, it means that, absent clear and present danger, government has no power to restrict expression because of the effect its message is likely to have on the public." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 575 (1980) (Blackmun, J., concurring in judgment).

instead invoking the false-statement law only to show that Ohio's ban on anonymous leafleting was not genuinely motivated by an interest in stopping false speech. *See id.* at 349-50 & n.12. Finally, the Court *invalidated* that law—even though it was merely a disclosure requirement— and so the decision is clearly insufficient to *uphold* a statute actually *suppressing* speech.

Regardless, the Commission's fatal problem is that however strong its state interest may be, it *admittedly* has no evidence that the false-statement law advances that interest in any material way. As in *Alvarez*, the Commission "points to no evidence to support its claim" that the law advances electoral integrity. 132 S. Ct. at 2549 (plurality). Instead, the Commission complains that "the consequences of deceptive false statements on elections are … inherently difficult to quantify." (Opp. 17 n.5.) Which is to say, there is no empirical evidence to support the Commission's claim that the false-statement law promotes the "integrity" of its elections or prevents anyone from being "defrauded" into casting their votes for the wrong candidate. This failure of proof alone requires invalidation of the statute. Even in the less-protected arena of *commercial* speech, the Supreme Court has repeatedly held that the state must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree," a burden that cannot be satisfied "by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). That is surely the minimum necessary to suppress *political* speech.[2]

---

[2] Notably, while it may be "difficult" to empirically evaluate the Ohio law's efficacy, it is surely *possible*, and no more difficult than in other cases where the Supreme Court has required empirical proof. *See, e.g.*, *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738-39 (2011) (requiring empirical proof of "direct causal link" between violent video games and harm to minors, not just "some correlation"). For example, the Commission could compare (using any number of objective measures) the integrity of Ohio's elections to those in states without false-statement laws. *Cf. Citizens United*, 558 U.S. at 357 (noting that Government did not argue or demonstrate that corporate expenditures "have corrupted the political process in those States" that do not restrict them). Indeed, this is the type of research that political scientists do on a regular basis. But the Commission has not even *tried* to do *any* empirical analysis at all, which reflects a lack of seriousness about its own purported state interest.

18

To be sure, as the Commission points out (Opp. 21), the "quantum of empirical evidence needed to satisfy heightened judicial review of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). But that only underscores the need for strong empirical evidence here, because not only is there is no historical support for speech-suppressing laws like Ohio's, but the notion that it will serve its asserted purposes is wholly implausible. At the threshold, there is no reason to believe that the Commission is better positioned to ferret out falsehoods than anyone else (including voters themselves, media, or objective observers)—or that the citizenry is willing to take the Commission's word as the gospel. And even if both of those dubious propositions were true, the statutory scheme does not actually allow this to happen in time to preserve the "integrity" of the election. As Ohio's Attorney General has explained, most false-statement complaints are filed days before an election, preventing the Commission from determining the truth or falsity of the statement before the election takes place. *See* Amicus Br. of Ohio Atty. Gen. at 14-16, *SBA*, 134 S. Ct. 2334 (2014) (No. 13-193) ("*AG Brief*"). Instead, the Commission issues preliminary "probable cause" findings, which are *not* final determinations on the merits, yet are "perceived by a substantial part of the electorate as the definitive pronouncement of the State of Ohio as to a candidate's or other speaker's truthfulness" and thus trigger "profound" political damage, even before final adjudication. *Id.* at 6. Thus, the false-statement law—in actual operation—*detracts from*, rather than *advances*, the supposed objective of ensuring a well-educated electorate.

Of course, even if the law cannot identify or punish false speech in time for an election, it may—in theory—*deter* false speech in the first place. But Ohio's law does not accomplish that objective either. The statute deters speech, to be sure, because of the burdens it allows political adversaries to impose on speakers—namely, "burdensome Commission proceedings" and a need

19

to "divert significant time and resources to hire legal counsel and respond to discovery requests in the crucial days leading up to an election." *SBA*, 134 S. Ct. at 2346. But those burdens are equally imposed on *truthful* speakers: Once a false-statement complaint is filed, the Commission *must* hold a hearing, costing the speaker time and money. There is thus "no system for weeding out frivolous complaints" before the speaker is burdened, *SBA*, 134 S. Ct. at 2345 (quoting *AG Brief* at 6), unlike under Minnesota's false-statement law, which at least allowed for dismissal on a "prima facie review of the complaint" *before* any probable-cause hearing, *281 Care Comm. v. Arneson*, No. 08-5215, 2013 U.S. Dist. LEXIS 10044, at *39 (D. Minn. Jan. 25, 2013).[3] As the Supreme Court thus explained, "the 'practical effect' of the Ohio false statement scheme is 'to permit a private complainant … to gain a campaign advantage without ever having to prove the falsity of a statement.'" 134 S. Ct. at 2346 (quoting *AG Brief* at 7). Since the law's deterrent effect does not distinguish *true* speech from *false*, that effect cannot justify the statute either. To the contrary, it creates precisely the chilling effect on truthful speech that is its defect.

> ## 2. *As a matter of both law and fact, counterspeech is an effective, less-restrictive means of correcting campaign lies.*

An independently dispositive flaw in Ohio's false-statement regime is that there is no reason why a less-restrictive alternative—namely, allowing the marketplace of political ideas to serve as the arbiter of "truth"—would not be equally if not more effective. As both the plurality and the concurring opinion in *Alvarez* emphasized, such "counterspeech" is the ordinary remedy, in a free, democratic society, for untruthful speech. *See Alvarez*, 132 S. Ct. at 2550 (plurality) ("The remedy for speech that is false is speech that is true. This is the ordinary course in a free

---

[3] The district court in *281 Care*, on remand after the Eighth Circuit directed application of strict scrutiny, upheld Minnesota's law. 2013 U.S. Dist. LEXIS 10044, at *22-38. That decision is incorrect for all of the reasons explained in this brief, and has since been appealed again to the Eighth Circuit, which heard oral argument in February 2014. *See* No. 13-1229 (8th Cir. Feb. 13, 2014), http://8cc-www.ca8.uscourts.gov/OAaudio/2014/2/131229.mp3 (audio of argument).

society.  The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."); *id.* at 2556 (Breyer, J., concurring in judgment) (agreeing that "more accurate information will normally counteract the lie").  If anything, robust debate is an even *more* effective remedy in the electoral context, because there are so many voices to correct the record—from opposing campaigns to independent media.  *Brown v. Hartlage*, 456 U.S. 45, 62 (1982) (citing "atmosphere of robust political debate protected by the First Amendment").

In the face of *Alvarez*, the Commission argues that "private counterspeech alone is not sufficient."  (Opp. 25.)  But, to support that assertion, it cites two *defamation* cases.  As already explained, defamation—unlike the speech proscribed by Ohio—is constitutionally unprotected. *See supra*, Part I.B.  And, as the Court recognized in one of the cases the Commission cites, one of the reasons public figures are subjected to a more demanding standard for proving defamation is precisely because they "enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974) (plurality).  Channels of communication are never more open than during electoral campaigns, which is why counterspeech is even more effective here than in the context of *Alvarez*.

There is no theoretical or empirical basis for the Commission's contention (Opp. 26) that "government counterspeech" is somehow more effective than *private* counterspeech.  But even if there were, that would only further condemn the false-statement law, by illustrating yet another less-restrictive means: A state-sponsored Ministry of Truth could issue official pronouncements about the "truth" or "falsity" of campaign materials *without* burdening what it deemed "false" speech or threatening to punish any speaker.  Limiting the Commission to that "truth-declaring" function would make its conduct more analogous to the other executive and legislative branch

actors who, as the Sixth Circuit noted, often "mak[e] judgments, and publicly announc[e] those judgments to the world, as to the truth or falsity of the actions and statements of candidates." *Pestrak*, 926 F.2d at 579. By contrast, Ohio's false-statement law is inherently *coercive*; it is specifically designed to *suppress* and *punish* false speech, not just to allow the Commission to participate in the marketplace of ideas. If a speaker refuses to cooperate with the Commission, he "may be deemed to have admitted the allegations in the complaint," which "may allow the commission to make a finding against [him]." Ohio Admin. Code § 3517-01-04(A). The Commission can also issue coercive subpoenas, enforceable through contempt sanctions in court, "compelling the attendance of witnesses and the production of relevant papers." Ohio Rev. Code Ann. § 3517.153(B). And, of course, there are *criminal penalties* attached to the law—a violator "shall be imprisoned for not more than six months or fined not more than five thousand dollars, or both," *id.* § 3517.992(V), and repeat offenders "shall be disfranchised," *id.* § 3599.39. These are the burdens and penalties that chill speech, and the state could eliminate them while retaining all of the supposed benefits of "government counterspeech." The false-statement law is accordingly far more burdensome than necessary to accomplish its supposed objectives.[4]

### 3. The false-statement law chills truthful speech, notwithstanding the illusory "limits" identified by the Commission.

Finally, the false-statement law is not "narrowly tailored" because it chills a substantial amount of *truthful* speech. As previously explained, the law burdens *all* speakers, as it enables the speaker's rivals "to gain a campaign advantage without ever having to prove the falsity of a statement." *SBA*, 134 S. Ct. at 2346 (quoting *AG Brief* at 7). The statute thus allows, in the

---

[4] As *Alvarez* confirms, the least-restrictive means test applies here. 132 S. Ct. at 2549 (plurality). The Commission cites *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n* as to the contrary, but that quote addressed content-neutral "time, place, or manner" regulations, not content-based prohibitions like Ohio's. 262 F.3d 543, 554 (6th Cir. 2001). And, even in that context, the court agreed that the restrictions must be "narrowly tailored." *Id.*

context entitled to the highest protection, abusive efforts to censor and penalize putative entrants to the marketplace of ideas.  (*See* PI Mem., Dkt. 120, at 16-18.)  *See Rickert*, 168 P.3d at 832 ("The mere threat of such a process will chill political speech.").  The Commission essentially ignores all of this, and all of the law's most problematic facets.  Instead, it contends that the law includes other "limiting features" that "insulate innocent speech."  (Opp. 23.)  Hardly so.

*First*, the Commission observes that the law requires a showing of "actual malice" and proof by "clear and convincing evidence," which together mean that only *clearly false* statements violate the statute.  (Opp. 23-24.)  But the same was true in *Alvarez*—the Stolen Valor Act "may be construed to prohibit only knowing and intentional acts of deception about readily verifiable facts within the personal knowledge of the speaker, thus reducing the risk that valuable speech is chilled."  132 S. Ct. at 2555 (Breyer, J., concurring in judgment).  Yet that was not enough:

> [T]here remains a risk of chilling that is not completely eliminated by *mens rea* requirements; a speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable.  And so the prohibition may be applied where it should not be applied, for example, to bar stool braggadocio or, in the political arena, subtly but selectively to speakers that the Government does not like.

*Id.*  That remaining chilling effect, notwithstanding the statutory *mens rea* requirement, is exponentially more powerful here, where (i) the falsehoods proscribed by Ohio's law concern *politics*, where "the tenets of one man may seem the rankest error to his neighbor," *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940), and thus are not as readily verifiable as statements about the receipt of military honors; (ii) the speaker is subject to substantial burdens and costs from the Commission proceedings, even if he is ultimately acquitted; and (iii) there is a strong political incentive for adversaries to impose those burdens on their rivals, which the statute allows them to easily do.  And on top of all that, the chilling effect of Ohio's law is far more troubling, because it implicates core political speech—not valueless lies like the Stolen Valor Act.

23

Moreover, the *mens rea* requirement actually *increases* the practical burdens and chilling effect of Ohio's law.  The fact that the speaker's subjective knowledge bears on liability becomes a basis for broad discovery into the speaker's political communications and affiliations, such as strategic discussions with political parties, other candidates, or campaign allies.  Such discovery has an obvious and severe chilling effect.  *See Buckley*, 424 U.S. at 64 ("[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) ("The compelled disclosure of political associations can have just such a chilling effect.").  This case is again a perfect example, as Rep. Driehaus followed the filing of his false-statement complaint with broad subpoenas seeking confidential campaign and lobbying communications.  (Dkt. 25-6.)

*Second*, the Commission points out that Ohio's law is limited to false statements that are subjectively made "to affect the outcome of the campaign."  (Opp. 24.)  But that is no limit at all. *Every* public statement about a candidate during an election campaign is made with that intent, or could easily be characterized as such.  This argument only highlights that Ohio's false-statement law "ranges very broadly."  *Alvarez*, 132 S. Ct. at 2555 (Breyer, J., concurring in judgment). Indeed, the law does not apply only to the direct proponent of the allegedly false speech, but also to commercial intermediaries like the company that was supposed to erect SBA's billboard in 2010.  *See* Ohio Rev. Code Ann. § 3517.21(B)(10) (forbidden to "[p]ost, publish, circulate, distribute, or otherwise disseminate" false statement).  As illustrated by Rep. Driehaus's ability to use the threat of a false-statement charge to coerce that company not to post SBA's billboards, this facet of the scheme amplifies the law's chilling effect: Even if a candidate or established advocacy organization were willing to bear the risks imposed by the Ohio law, the actors they rely on to actually publicize their messages may still be chilled, effectively thwarting the speech.

*Third*, the Commission argues, with no hint of irony, that the false-statement law includes "a variety of procedural safeguards to ensure that legitimate speech is protected." (Opp. 24.) It includes, on this list, that targets of the law must face "Commission proceedings" before any prosecution; that "[e]xpedited panel hearings" are held in close proximity to elections; and that parties can "examine witnesses, and present evidence," at full Commission hearings. (*Id.*) These, however, are among the aspects of the scheme that *exacerbate* its chilling effect, as the Supreme Court has indeed already found. *SBA*, 134 S. Ct. at 2346. Commission hearings, discovery, and expedited proceedings in the critical days before the election are precisely the *burdens* that the statute allows political adversaries to impose on speakers—to cause political damage that cannot be undone before the election and to distract the speaker (in time and money) from its advocacy. *Cf. Citizens United*, 558 U.S. at 335 (law may "function as the equivalent of prior restraint" by imposing "onerous restrictions" and "heavy costs" on speakers).

Once again, this case is a vivid illustration of how illusory all of these supposed "limits" are. Even though the law supposedly covers only intentionally false factual statements, SBA was haled before the Commission to defend its *interpretation* of a federal *statute*. Even though the law supposedly requires clear and convincing evidence, the Commission found probable cause to proceed because it *disagreed* (by a 2-1 vote) with SBA's reasonable interpretation. Even though the law supposedly contains many procedural protections, SBA was forced to pay legal fees and divert its attention from the ongoing campaign to prepare for and appear at a preliminary hearing. And even though the law supposedly chills no speech, Driehaus's legal threats prevented SBA's billboards from being erected, and COAST likewise refrained from speaking as a result.

In short, far from providing "breathing room" for truthful speech, Ohio's false-statement law broadly stifles highly valuable speech at the core of the First Amendment.

### III.    THE OHIO LAW IS FACIALLY INVALID, BECAUSE MOST IF NOT ALL OF ITS APPLICATIONS WOULD BE UNCONSTITUTIONAL.

Finally, the Commission argues that even if the false-statement law is unconstitutional, it should not be invalidated on its face, because in some applications—namely, as applied to fraud and defamation—it would be constitutional.  (Opp. 27-30.)  That is a badly misguided plea.[5]

SBA's argument in this case is that the false-statement law, by authorizing a Ministry of Truth to act as arbiter of political truth rather than allowing the marketplace of ideas to sort out campaign "lies," violates the First Amendment in *all* of its applications.  It will *always* be true that (i) no "substantial" state interests are demonstrably advanced by the statutory proscription on false campaign speech; (iii) counterspeech alone would suffice, without such proscription; and (iii) the law's proscription chills truthful speech.  None of those points depends on any case-by-case facts, which is why the Supreme Court agreed that SBA's challenge here was "facial," not "as-applied."  *SBA*, 134 S. Ct. at 2340 n.3.  Put another way, the defects with having a state-appointed Ministry of Truth burden and punish campaign "lies" are *systemic*, not limited to a few unique cases.  In situations like this, when the Supreme Court finds that a speech-suppressing statute fails the applicable level of scrutiny, it invalidates the law in its entirety.  *E.g.*, *Alvarez*, 132 S. Ct. at  2551 (plurality) (ruling that Stolen Valor Act as a whole "infringes upon speech protected by the First Amendment"); *Brown*, 131 S. Ct. at 2742 (affirming facial invalidation of law restricting violent video games); *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2666, 2672 (2011) (accepting plaintiffs' "facial" challenge because statute as a whole failed scrutiny).

---

[5] The Commission also appears to contend that the law could be constitutionally applied to statements that (unlike SBA's statements about Driehaus) are objectively, verifiably, and factually false.  (Opp. 29.)  But that is obviously wrong, because in *Alvarez*, the Stolen Valor Act *exclusively* forbade objective, verifiable lies—yet the Court still invalidated it on its face.  132 S. Ct. at 2551 (plurality); *id.* at 2555 (Breyer, J., concurring in judgment) (noting that Act "may be construed to prohibit only knowing and intentional acts of deception about readily verifiable facts within the personal knowledge of the speaker").  The dispositive point—there as here—is that even such clear lies are not outside the protection of the First Amendment.

The Commission suggests that because defamation and fraud are unprotected by the First Amendment, Ohio's law could constitutionally be applied to defamatory or fraudulent statements. But the statute is not limited to such statements, as already explained; rather, it applies also to positive false statements, negative but non-defamatory statements, and statements that cause no harm. *See supra*, Part I. To read it otherwise "requires rewriting, not just reinterpretation." *United States v. Stevens*, 130 S. Ct. 1577, 1592 (2010). But a statute that is unconstitutional as written cannot be preserved by judicially rewriting it to incorporate elements that the legislature did not include. Courts cannot "rewrite a … law to confirm it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884-85 (1997) (refusing to narrow unconstitutional statute to "a judicially defined set of specific applications"). Thus, even if Ohio *could* enact a narrower law criminalizing only *defamatory* campaign speech, it has *not*—and this Court cannot do so for it.

The cases cited by the Commission principally relate to the "facial overbreadth" doctrine, which is irrelevant here. "Overbreadth" challenges occur when a plaintiff whose constitutional rights are *not* burdened by a statute nonetheless argues that the statute violates the rights of *other* parties. Typically, "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 767 (1982). But in First Amendment cases, the courts make an exception, out of fear that awaiting challenges from other plaintiffs would "repeatedly chill the exercise of expressive activity by many individuals." *Id.* at 772. Plaintiffs may thus "challenge a statute not because [their] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech."

*Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc) (noting that "even though [statute] may be applied constitutionally to [plaintiffs]," overbreadth doctrine would allow court "to strike the law in its entirety based on its application to other individuals not before the court," if overbroad).

Here, of course, the false-statement law is not *constitutional* as applied to SBA's speech but *unconstitutional* as to others. Rather, it is unconstitutional as to *everyone*, including SBA, for the reasons explained above. And even if the Commission were correct that the statute could be constitutionally applied to defamatory speech, this Court has already held that SBA's speech is *not* defamatory. (Order, Dkt. 108.) In other words, to the extent that there is a line that can be drawn between constitutional and unconstitutional applications of this statute, as the Commission posits, application to SBA is clearly on the unconstitutional side of that line. The Commission's argument about theoretical constitutional applications is thus beside the point, as is its reliance on "overbreadth" cases in which the plaintiff's own conduct is *not* constitutionally protected.

Finally, even if the "substantial overbreadth" test applied here, Ohio's law clearly fails it. Under that test, a law proscribing speech is facially void if "a substantial number of instances exist in which the law cannot be applied constitutionally." *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013). That is certainly true here; the law's defects are not limited to a handful of cases outside its "core." *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965 (1984). Rather, Ohio's law sweeps far more broadly than just legally defamatory or fraudulent speech, for all the reasons explained in Parts I, *supra*. It thus remains true that "a substantial number of instances exist" in which Ohio's law "cannot be applied constitutionally." *Speet*, 726 F.3d at 872. Facial invalidation is therefore the only appropriate remedy, especially since anything less would "chill the exercise of expressive activity by many individuals." *Ferber*, 458 U.S. at 772.

In short, just as the Court in *Alvarez* did not ask whether the Stolen Valor Act could be constitutionally applied to a subset of situations not specifically carved out by the statute, *e.g.*, false claims to have won military honors when used to obtain money or property, or when made to government officials, or when made in court under penalty of perjury—even though Justice Breyer specifically acknowledged that "a similar but more finely tailored statute" might be able to avoid constitutional deficiencies, *see* 132 S. Ct. at 2556—this Court has no warrant to engage in such counterfactual, hypothetical speculation here.  The false-statement law as written violates the First Amendment and SBA's rights, and it therefore must be invalidated and enjoined.

## CONCLUSION

For the reasons above, this Court should preliminarily enjoin the Commission and its members from enforcing Ohio Revised Code Ann. § 3517.21(B)(9)-(10), and also grant summary judgment to SBA and permanently enjoin enforcement of those provisions.

Respectfully submitted,

*/s/ David R. Langdon*

| | |
|---|---|
| Michael A. Carvin* (D.C. Bar No. 366784) | David R. Langdon (0067046) |
| Yaakov M. Roth (D.C. Bar No. 995090) | *Trial Attorney* |
| JONES DAY | Joshua B. Bolinger (0079594) |
| 51 Louisiana Avenue, N.W. | LANGDON LAW LLC |
| Washington D.C. 20001 | 8913 Cincinnati-Dayton Road |
| (202) 879-3939 | West Chester, Ohio 45069 |
| (202) 626-1700 fax | (513) 577-7380 |
| macarvin@jonesday.com | (513) 577-7383 fax |
| | dlangdon@langdonlaw.com |
| *admitted *pro hac vice* | |
| | Robert A. Destro (0024315) |
| | 2312 N. Powhatan Street |
| | Arlington, VA 22205-2116 |
| | (202) 905-6064 |
| | (703) 534-1530 fax |
| | robertdestro@hotmail.com |
| | |
| | *Counsel for Plaintiff Susan B. Anthony List* |

## CERTIFICATE OF SERVICE

I certify that the foregoing *Plaintiff Susan B. Anthony List's Reply Memorandum in Support of Its Motions for Preliminary Injunction and Summary Judgment* was served on August 15, 2014, upon all counsel of record, via the court's electronic filing system.


*/s/ Joshua B. Bolinger*
Joshua B. Bolinger