# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| SUSAN B. ANTHONY LIST, *et al.*, | : | Case No. 1:10-cv-720 |
| Plaintiffs, | : |  |
|  | : | Judge Timothy S. Black |
| vs. | : |  |
|  | : |  |
| OHIO ELECTIONS COMMISSION, *et al.*, | : |  |
| Defendants. | : |  |

## ORDER:

## (1) GRANTING PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION

## (2) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; and

### (3)   PERMANENTLY ENJOINING THE ENFORCEMENT OF OHIO'S POLITICAL FALSE-STATEMENTS LAWS[1] BY THE OHIO ELECTIONS COMMISSION AND ITS MEMBERS

This civil action is currently before the Court on Plaintiffs' motions for a preliminary injunction (Docs. 120, 121) and the parties' responsive memoranda (Docs. 133, 135, 136).[2]  Also pending before the Court are the parties' cross-motions for summary judgment, each asking respectively that Ohio's political false-statements laws, Ohio Rev. Code § 3517.21(B)(9)-(10), be declared unconstitutional or constitutional. (Docs. 126, 134).  On September 4, 2014, the Court heard oral argument on the motion. The entire case is ripe for final resolution in this trial court.

---

[1] Ohio Rev. Code §§ 3517.21(B)(9) and 3517.21(B)(10).

[2] Plaintiffs include Susan B. Anthony List ("SBA List") and the Coalition Opposed to Additional Spending & Taxes ("COAST").  Plaintiffs originally filed separate lawsuits which were consolidated by this Court.  (*See* 11/19/10 Notation Order).

## OVERVIEW

**"[We are not] arguing for a right to lie.  We're arguing that we have a right not to have the truth of our political statements be judged by the Government."**
This is the issue presented, as stated by Plaintiffs Susan B. Anthony List (an anti-abortion advocacy group) and the Coalition Opposed to Additional Spending & Taxes.

Lies have no place in the political arena and serve no purpose other than to undermine the integrity of the democratic process.  The problem is that, at times, there is no clear way to determine whether a political statement is a lie or the truth.  What is certain, however, is that **we do not want the Government (*i.e.*, the Ohio Elections Commission) deciding what is political truth** -- for fear that the Government might persecute those who criticize it.  Instead, in a democracy, **the voters should decide**.  And thus today the Court must decide **whether Ohio's political false-statements laws are the least restrictive means of ensuring fair elections.  The short answer is no.**

This Court is not the first to reach such a decision.  Just days ago, the federal Court of Appeals for the Eighth Circuit struck down as unconstitutional Minnesota's political false-statements laws, which are exceedingly similar to Ohio's, finding that the law "**is not necessary, is simultaneously overbroad and underinclusive, and is not the least restrictive means of achieving any stated goal.**" *281 Care Comm. v. Arneson*, No. 13-1229, 2014 U.S. App. LEXIS 16901 (8th Cir. **Sept. 2, 2014**).

Here in Ohio, there is no reason to believe that the OEC is positioned to determine what is true and what is false when it comes to political statements.  In fact, it is entirely possible that a candidate could make a truthful statement, yet the OEC would determine a

few days before an election that the statement is false, penalizing the candidate for speaking the truth and chilling further truthful speech. Lawyers and courts call such a statute "overbroad" and hence unconstitutional. Further, the statute does not even ensure that the hearing process will conclude in time to preserve the integrity of the election.

What then is the alternative? The United States Supreme Court has clearly signaled the answer. For starters, the Supreme Court held flatly in 2012 that: "**The remedy for speech that is false is speech that is true**. This is the ordinary course in a free society. **The response** to the unreasoned is the rational; to the uninformed, the enlightened; **to the straight-out lie, the simple truth**." *United States v. Alvarez*, 132 S. Ct. 2537, 2550 (2012) (emphasis supplied). The more modern recitation of this longstanding and fundamental principle of American law was recently articulated by Frank Underwood in *House of Cards*: **"There's no better way to overpower a trickle of doubt than with a flood of naked truth."**

In short, the answer to false statements in politics is not to force silence, but to encourage truthful speech in response, and to let the voters, not the Government, decide what the political truth is. Ohio's false-statements laws do not accomplish this, and the Court is not empowered to re-write the statutes; that is the job of the Legislature.

Accordingly, the Court finds that Ohio's laws are more burdensome than necessary to accomplish their alleged objectives and do not satisfy strict scrutiny under the Constitution of the United States. Therefore, **the Court strikes down the laws as unconstitutional and permanently enjoins the Ohio Elections Commission and its members from enforcing Ohio's political false-statements laws.**

# I.    BACKGROUND FACTS

Plaintiffs seek a preliminary injunction against the enforcement of Ohio Revised Code Sections 3517.21(B)(9) and 3517.21(B)(10) by the Ohio Elections Commission ("OEC").[3]  Plaintiffs challenge the law on First Amendment grounds, both facially and as applied.

This Court originally dismissed Plaintiffs' claims as non-justiciable, concluding that Plaintiffs did not present a sufficiently concrete injury for purposes of standing or ripeness.  The Sixth Circuit affirmed on ripeness grounds.  *Susan B. Anthony List v. Driehaus*, 525 F. App'x 415 (6th Cir. 2013).  On June 16, 2014, the United States Supreme Court reversed, holding that Plaintiffs could proceed with their First Amendment challenge to Ohio's political false-statements laws.  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014).[4]

Specifically, the Supreme Court concluded that Plaintiffs had "alleged a sufficiently imminent injury for purposes of Article III."  *Id.* at 2338.  In doing so, the Supreme Court noted that Plaintiffs' "as-applied claims 'are better read as facial objections to Ohio's laws.'"  *Id.* at 2340 n. 3.

---

[3] The Ohio Elections Commission, originally established in 1974, was reformulated as a seven member body in 1995, and reestablished as an independent government agency.  Membership consists of six members (three members from each major political party in Ohio), appointed by the Governor upon recommendation by the Democratic and Republican caucuses of the General Assembly.  By statute, the seventh member cannot be affiliated with either major political party and is appointed by the six partisan members of the Commission.  *See* Ohio Elections Commission History available at: http://elc.ohio.gov/History.stm (last visited on Sept. 10, 2014).

[4] Plaintiff SBA List has subsequently dismissed all claims it had asserted against Defendant Driehaus, in order to proceed only against the OEC and its members in their official capacity.  (Doc. 131).

Although the speech that initially sparked this lawsuit concerned the 2010 elections, Plaintiffs maintain that they will continue to criticize Members of Congress for supporting the Affordable Care Act ("ACA" (also known as Obamacare)) because it allegedly funds abortion. Specifically, Plaintiffs plan to speak during the upcoming campaign about U.S. Representative Marcy Kaptur, who voted for the ACA, despite her stated, longstanding support of pro-life values. Accordingly, Plaintiffs face a credible threat of triggering enforcement proceedings by the OEC this fall.

### A. Ohio's Political False-Statements Laws

In Ohio, it is a <u>crime</u> to "[p]ost, publish, circulate, distribute, or otherwise disseminate a false statement concerning a candidate, either knowing the same to be false or with reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate." Ohio Rev. Code § 3517.21(B)(10). Likewise, it is a crime to "[m]ake a false statement concerning the voting record of a candidate or public official." Ohio Rev. Code § 3517.21(B)(9). Together, these provisions comprise Ohio's political false-statements laws.

To commit a violation of (B)(9), a person must have knowledge of the offending statement's falsity. *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 577 (6th Cir. 1991) (recognizing that (B)(9) affects only the *knowing* making of false statements). Under (B)(10), a person must act with actual malice, meaning either knowledge or reckless disregard of falsity. *McKimm v. Ohio Elections Comm'n*, 729 N.E.2d 364, 372-73 (Ohio 2000).

Violation of Ohio's political false-statements laws is a first-degree misdemeanor. Ohio Rev. Code § 3599.40. Thus, "[w]hoever violates section 3517.21 … shall be imprisoned for not more than six months or fined not more than five thousand dollars, or both." Ohio Rev. Code § 3517.992(V).

Procedurally, "any person" may file a complaint with the OEC alleging a violation of these political false-statements laws. Ohio Rev. Code § 3517.153(A). If a complaint alleging a false statement is filed within 60 days of a primary election or 90 days of a general election, the OEC must hold an "expedited hearing," at which a three-member panel of the OEC's political appointees decides if "[t]here is probable cause to believe that the failure to comply with or the violation of a law alleged in the complaint has occurred." Ohio Rev. Code § 3517.154(A) and § 3517.156(A), (C). If so, the panel must refer the case to the full Commission, and if the full Commission then finds a violation by "clear and convincing evidence," the OEC "shall refer the matter to the appropriate prosecutor." Ohio Rev. Code § 3517.156(C)(2) and § 3517.155(D)(2). *See generally SBA List*, 134 S. Ct. at 2338-2339 (describing statutory regime). Alternatively, the OEC's regulations state that it may simply issue a reprimand. Ohio Admin. Code § 3517-1-14(D).

## B. Burdens on Speech

Ohio's statute allows anyone to trigger proceedings against a speaker. In fact, political candidates have exploited the statute to silence opponents by strategically deploying OEC complaints to burden and distract their electoral rivals. *SBA List*, 134 S. Ct. 2334 (citing Amicus Brief of the Ohio Atty. Gen. at 7). Indeed, when a complaint is

filed, a probable cause hearing must be held and **there is "no system for weeding out frivolous complaints**." *Id.* at 6 (emphasis supplied). "The speaker is forced to use time and resources responding to the complaint, typically at the exact moment that the campaign is peaking and his time and resources are best used elsewhere." *Id.* at 15.

Moreover, once a panel finds probable cause, a "very low hurdle," discovery is allowed, which permits political candidates to delve into the confidential communications of their opponents. *Id.* at 5. And the probable cause finding "is perceived by a substantial part of the electorate as the definitive pronouncement of the State of Ohio as to a candidate's or other speaker's truthfulness" and thus triggers "profound" political damage, even before a final OEC adjudication. *Id.* at 6. Thus, complaints to the OEC can "be manipulated … so that the costs they impose on a political opponent form part of the complainant's campaign strategy." *Id.* at 5. Indeed, the OEC concedes that political campaigns "use the Commission as a part of their activities." Ohio Elections Commission: History. Available at: http://elc.ohio.gov/History.stm (last visited Sept. 11, 2014).

The manipulation of the OEC is evidenced by the fact that most complaints are filed just days before an election, so that the target will have no opportunity for judicial review before the election. *SBA List*, 134 S. Ct. 2334 (citing Amicus Br. of Ohio Atty. Gen. at 16). The complainants then routinely move to dismiss the complaints after the election is over, having already "inflicted" the damage of "time and cost to the opposition of having to defend itself in the campaign's final days." *Id.* at 21. The OEC regularly and routinely grants these motions. *Id.* at 20.

### C.  Probable Cause

In 2010, SBA List criticized certain Members of Congress, including U.S. Representatives Steve Driehaus and Marcy Kaptur of Ohio, who voted for the ACA. Among other things, SBA List planned to erect large billboards stating: "Shame on Steve Driehaus! Driehaus voted FOR taxpayer-funded abortion."  (Doc. 25-3 at 10).  After SBA List's plan for billboards was reported in the news, Driehaus filed a complaint with the OEC, alleging that SBA List was violating Ohio's political false-statements laws.  (Doc. 25-3 at 2).  Driehaus's complaint focused on his claim that the ACA does not specifically appropriate federal funds for abortions, and that SBA List's speech was therefore false.

The OEC held an expedited hearing and voted 2-1 that there was probable cause to believe that SBA List had committed the crime.  (Doc. 25-5 at 30).  Driehaus then served discovery requests to SBA List and third parties.  (Docs. 25-6, 25-7).  Driehaus also noticed depositions of three SBA List officials, subpoenaed officials of allied organizations, and sought the production of documents, including communications with political party committees and Members of Congress and their staff.  (*Id.*)

Ultimately, after SBA List filed this First Amendment suit seeking to restrain enforcement of the political false-statements laws, Driehaus lost re-election and moved to withdraw his OEC complaint, which motion the OEC granted (without objection from SBA List).

### D.  2014 Elections

Plaintiffs' legal claims remain alive today because Plaintiffs want to criticize Ohio candidates during the current election cycle, but fear that doing so will subject them to

enforcement proceedings under the political false-statements laws. *SBA List*, 134 S. Ct. at 2346. In particular, Plaintiffs want to post billboards concerning U.S. Representative Marcy Kaptur, who is seeking reelection on November 4, 2014. SBA List maintains that the billboard will state: "Shame on Marcy Kaptur! Kaptur voted FOR taxpayer-funded abortion." (Doc. 120, Ex. A at ¶ 17). However, because of the OEC's probable cause finding that the statement was false relating to the same speech regarding Driehaus in 2010, Plaintiffs claim that engaging in this speech again in this fall's election season will cause them to suffer substantial financial, political, and reputational harms, including potential <u>criminal</u> penalties (*i.e.*, up to six months in prison). (*Id.* at ¶ 8).

In these circumstances, the United States Supreme Court confirmed this summer that Plaintiffs' facial First Amendment challenge to Ohio's political false-statements laws is ripe for review. *SBA List*, 134 S. Ct. at 2341 n.5.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(a)-(b) permits a party to seek injunctive relief when the party believes that it will suffer immediate and irreparable injury, loss, or damage. Nevertheless, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not

issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Ne. Ohio Coal. For Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006). These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

To obtain a permanent injunction, the plaintiff must show that: (1) he has suffered an irreparable injury; (2) the remedies available at law are inadequate to compensate for the injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The decision to grant a permanent injunction is within the judicial discretion of the district court. *Wayne v. Vill. of Sebring*, 36 F. 3d 517, 531 (6th Cir. 1994).

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits

The Supreme Court in 2012 held flatly that:  "**The remedy for speech that is false is speech that is true**.  This is the ordinary course in a free society.  **The response** to the unreasoned is the rational; to the uninformed, the enlightened; **to the straight-out lie, the simple truth**."  *Alvarez*, 132 S. Ct. at 2550 (emphasis supplied).  This has always been the approach in our free and democratic society.  *See Whitney*, 274 U.S. at 377 ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by

the processes of education, **the remedy to be applied is more speech, not enforced silence"**).

In evaluating Plaintiffs' motion for the Court to strike down as unconstitutional Ohio's political false-statements laws, the first factor to consider is "whether the plaintiff has demonstrated a strong likelihood of success on the merits." *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). Indeed, in First Amendment cases such as this one, the likelihood of success on the merits "often will be determinative," as the other factors necessarily depend on whether the challenged law is unconstitutional. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

Plaintiffs argue that Ohio's political false-statement laws are unconstitutional because they invade a citizen's right to speak freely in politics. As Plaintiffs put it: **"[We are not] arguing for a right to lie. We're arguing that we have a right not to have the truth of our political statements be judged by the Government."** (Sept. 4, 2014 Oral Argument Transcript at 46). The distinction is critical and is based on the quintessential truth that "[t]he First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs." *Stevens*, 130 S. Ct. at 1585.

### *1.    Restriction on Protected Speech*

In defense of Ohio's political false-statements laws, Defendants argue that a knowingly false statement is not protected speech, and, therefore, is not subject to First Amendment protection. Defendants highlight that the Sixth Circuit (prior to *Alvarez*)

11

held that Ohio's political false-statements laws are facially constitutional. *Pestrack v. Ohio Elections Comm'n*, 926 F.2d 573, 577-78 (6th Cir. 1991).

However, the only federal appellate court which has considered the merits of a false statement statute like Ohio's post-*Alvarez* very recently declared the statute unconstitutional. *281 Care Comm.*, No. 13-1229, 2014 U.S. App. LEXIS 16901. As to the Minnesota political false-statements laws, which are exceedingly similar to Ohio's, the federal Court of Appeals for the Eighth Circuit held: "Even if we were to assume that the asserted compelling interests discussed herein pass muster for purposes of this constitutional analysis, no amount of narrow tailoring succeeds because [Minn. Stat.] § 211B.06 is not necessary, is simultaneously overbroad and underinclusive, and is not the least restrictive means of achieving any stated goal." *Id.* at 22-23. While not binding on this Court, the Eighth Circuit's opinion is highly persuasive.

Moreover, as the Supreme Court has explained: "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). This democratic approach comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression that the First Amendment seeks to guarantee. *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964) ("Th[e] erroneous statement is inevitable in free debate."). Accordingly, "[t]he First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the

12

costs." *Stevens*, 130 S. Ct. at 1585. Thus, the Supreme Court instructs that "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

Therefore, as the Supreme Court stated in *Citizens United*: "The [Supreme] Court has never endorsed the categorical rule … that false statements receive no First Amendment protection." *Id.* Instead, "[e]ven when considering some instances of defamation or fraud, the [Supreme] Court has instructed that falsity alone may not suffice to bring the speech outside the First Amendment." *Id.*

So while knowingly false speech is not categorically exempt from First Amendment protection in the same manner as "fighting words, obscenity, child pornography, and defamation," *281 Care*, 638 F.3d at 633, knowingly false political speech is not automatically akin to fraud or defamation. While knowingly false speech may be an element of fraud or defamation, false political speech by itself does not implicate "important private interests." *Id.* at 634. As a result, knowingly false political speech does not fall entirely outside of First Amendment protection, and any attempt to limit such speech is a content-based restriction, subject to close review.

### 2. *Level of Scrutiny*

"Content-based speech restrictions can only stand if they meet the demands of strict scrutiny." *281 Care*, 638 F.3d at 633, 636. To satisfy the strict scrutiny test, a law must be "narrowly tailored to achieve a compelling governmental interest." *Abrams v. Johnson*, 521 U.S. 74, 82 (1997). Ohio's statute is content-based because it applies only to certain speech about candidates. *See, e.g., Rickert v. Pub. Disclosure Comm'n*, 168

P.3d 826, 828 (Wash. 2007) (applying strict scrutiny to Washington false-statement law).

The fact that the law targets political speech only further supports such a finding.

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995) ("When a law burdens

core political speech, … we uphold the restriction only if it is narrowly tailored to serve

an overriding state interest").

In *Alvarez*, the Supreme Court addressed the constitutional challenge of a man

charged under the Stolen Valor Act, 18 U.S.C. Section 704, with falsely representing

himself as a recipient of a decoration or medal from Congress or the armed forces.

132 S. Ct. 2537.  In a split decision, a majority of the justices upheld the Ninth Circuit

Court of Appeals' ruling that the Stolen Valor Act was unconstitutional.  *Id.* at 2551.  In

conducting its First Amendment analysis, a four-justice plurality held that strict scrutiny

must apply to the Stolen Valor Act.  *Id.* at 2548-51.[5]  The plurality held that the law was

not necessary to achieve compelling interests and that less restrictive alternatives existed.

*Id.* at 2550-51.  The same is true here.

### a.     Compelling Interest

Defendants argue that Ohio's statute satisfies the strict scrutiny test because Ohio

has a compelling interest in protecting the integrity of its elections.  *See, e.g., Wesberry v.*

*Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the

right to vote is undermined.").  Ohio's interest in preventing fraud "carries special weight

during election campaigns when false statements, if credited, may have serious adverse

---

[5] The concurring justices held that intermediate scrutiny should apply, and still struck down the law as unconstitutional, noting that Congress could have passed a more "finely tailored" statute.  *Id.* at 2556.

consequences for the public at large." *McIntyre*, 514 U.S. at 349. Alas, there do indeed exist some political candidates who are "unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

However, in *McIntyre*, the Supreme Court did <u>not</u> describe the state interest in preventing false speech as "compelling" or even "substantial," saying only that it was "legitimate" and has "special weight during election campaigns." 514 U.S. at 349, 351. *McIntyre* expressly refrained from any decision regarding the constitutionality of Ohio's political false-statements laws. Moreover, Defendants cite no evidence that the false statements laws are "actually necessary" to achieve their interest. *Brown v. Entm't Merch. Ass'n*, 131 S. Ct. 2729, 2738 (2011). To be actually necessary, there must be a direct causal link between the restriction imposed and the injury to be prevented. *Id.*[6] Here, instead, Defendants admit that "the consequences of deceptive false statements on elections are … inherently difficult to quantify." (Doc. 133 at 17 n. 5).

Furthermore, there is no reason to believe that the OEC is positioned to determine what is true and what is false. In fact, the statute does not even ensure that the hearing process will conclude in time to preserve the integrity of the election, because most false-statement complaints are filed days before an election, preventing the OEC from determining the truth or falsity of the statement before the election takes place. *SBA List*,

---

[6] The Supreme Court has required empirical proof in the past. *See, e.g., Entm't Merchs. Ass'n*, 131 S. Ct. at 2738-39 (requiring empirical proof of a "direct causal link" between violent video games and harm to minors, not just "some correlation").

134 S. Ct. 2334 (citing Amicus Br. of Ohio Atty. Gen. at 14-16). Instead, the OEC issues preliminary "probable cause" findings, which are not final determinations on the merits, yet are "perceived by a substantial part of the electorate as the definitive pronouncement of the State of Ohio as to a candidate's or other speaker's truthfulness" and thus trigger "profound" political damage, even before final adjudication. *Id.* at 6.

As a fallback argument, Defendants assert that even if the law cannot identify or punish false speech in time for an election, it may—in theory—deter false speech in the first place. However, in practice, the evidence supports a finding that the statute actually deters speech, because of the burden it places on all speakers, including <u>truthful</u> speakers.

Specifically, the OEC proceedings require a candidate to "divert significant time and resources to hire legal counsel and respond to discovery requests in the crucial days leading up to an election." *SBA List*, 134 S. Ct. at 2346. **<u>Such burdens are equally imposed on truthful speakers</u>**, because once a false statement complaint is filed, the OEC must hold a hearing which costs the speaker time and money. And, worse yet, unlike the recently-declared unconstitutional Minnesota false-statement law, which allowed for dismissal on a "*prima facie* review of the complaint" before any probable cause hearing, Ohio's process does not weed out frivolous complaints before the speaker is burdened. *Id.* at 2345. "[T]he practical effect of the Ohio false statement scheme is to permit a private complainant … to gain a campaign advantage without ever having to prove the falsity of a statement." *Id.* at 2346.

Allegedly, Ohio's law is meant "[t]o protect voters" from being swayed by lies. Accordingly, the state interest is not protecting citizens from personal injuries, but rather

paternalistically protecting the citizenry at large from "untruths" identified by Government appointees.  *See, e.g., 281 Care*, 638 F.3d at 635-36 ("This law put the Minnesota state government in the unseemly position of being the arbiter of truth about political speech").  Unlike in *Alvarez*, where the only factual issue, whether you have been awarded medals or not, was easily ascertainable, the factual issues raised before the OEC are far more complicated and require a sophisticated analysis.

Therefore, Defendants have failed to evidence that Ohio's statute actually protects the compelling interest of protecting the integrity of elections.

### b.    Narrowly Tailored

When the Government seeks to regulate protected speech, the restriction must be the "least restrictive means among available, effective alternatives."  *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665-66 (2004).  If a statute limiting otherwise protected speech is achievable by less restrictive means, the restriction does not survive strict scrutiny.  A statute is "unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."  *Id.*

Plaintiffs argue that the statute is not narrowly tailored, because it chills a substantial amount of truthful speech.  *Alvarez*, 132 S. Ct. 2555-56 (suggesting that limitations on false political speech must balance the potential harm lies are likely to cause against the risk of chilling valuable speech).  A statute is unconstitutionally over-inclusive or overbroad if it "sweep[s] too broadly" in restricting speech.  *Wersal v. Sexton*, 674 F.3d 1010, 1024-26 (6th Cir. 2012).  In addition to unnecessarily restricting speech by its very terms, a statute may also be overbroad if it "chills" a speaker from

17

engaging in otherwise protected speech. *See, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). For example, the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby "chilling" a kind of speech that lies at the First Amendment's heart. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).

Defendants argue that Sections 3517.21(B)(9)-(10) provide more than enough breathing space to prevent First Amendment harm. Specifically, the provisions require both actual malice and clear and convincing evidence. "[B]reathing space is provided by a constitutional rule that allows public figures to recover for libel or defamation only when they can prove both that the statement was false and that the statement was made with the requisite level of culpability." *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988).

In *Alvarez*, the Stolen Valor Act was "construed to prohibit only knowing and intentional acts of deception about readily verifiable facts within the personal knowledge of the speaker, thus reducing the risk that valuable speech is chilled." 132 S. Ct. at 2555. However, the Supreme Court found that was <u>not enough</u>.

> **[T]here remains a risk of chilling that is not completely eliminated** by *mens rea* requirements; a speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable. And so **the prohibition may be applied where it should not be applied, for example,** to bar stool braggadocio or, **in the political arena, subtly but selectively to speakers that the Government does not like.**

*Id*. (emphasis supplied).

18

Here, in this case, notwithstanding the statutory *mens rea* requirements, the chilling effect is more powerful, because the falsehoods concern politics, and even the truthful speaker is subject to substantial burdens and costs from the OEC proceedings, even if ultimately acquitted.  Moreover, the fact that the speaker's subjective knowledge bears on the liability actually becomes a basis for broad and hugely burdensome discovery into the speaker's political communications and affiliations, such as strategic discussions with political parties, other candidates, or campaign allies.  This type of discovery has a significant chilling effect.  *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) ("The compelled disclosure of political associations can have just such a chilling effect").

Defendants argue next that the law is narrowly tailored because the OEC provides a number of procedural safeguards to ensure that legitimate speech is protected.  However, in practice, these procedural safeguards actually exacerbate the statute's chilling effect because, for example, discovery often takes place in the critical days before the election, which distracts the speaker from its advocacy.

Defendants also argue that Ohio's law is narrowly tailored because it is limited only to false statements that are subjectively made "to affect the outcome of the campaign."  However, every public statement about a candidate during an election campaign is made with that intent, or could easily be characterized as such, which further supports a finding that Ohio's false-statements laws "ranges very broadly."  *Alvarez*, 132 S. Ct. at 2555.

Nothing in Ohio's law restricts it to "material" falsehoods or those that "succeeded" in misleading voters or causing electoral harm.  In fact, the law applies not only to the speaker of the false statement but also to commercial intermediaries like the company that was supposed to erect SBA List's billboard in 2010.  *See* Ohio Rev. Code § 3517.21(B)(10) (forbidden to "[p]ost, publish, circulate, distribute, or otherwise disseminate" false statement).

Speaking the truth in response to the lie, called "counterspeech" by lawyers and courts, is a less restrictive yet equally effective means to prevent voter deception about candidates.  "**The remedy for speech that is false is speech that is true**.  This is the ordinary course in a free society.  **The response** to the unreasoned is the rational; to the uninformed, the enlightened; **to the straight-out lie, the simple truth.**"  *Alvarez*, 132 S. Ct. at 2550 (emphasis supplied).

Here, Defendants have not proffered any facts that support a finding that the public requires the Government's help in determining the veracity of political rhetoric. Indeed, instead of limiting the OEC to "truth-declaring" functions, the political false-statements laws are inherently coercive, because they are specifically designed to suppress speech by punishing speech determined by the Government to be false.

While this Court is not convinced, especially in the wake of *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), that counterspeech will always expose lies, Ohio's political false-statements laws do not provide a framework under which the OEC can remedy this issue, because the OEC cannot issue a final determination regarding the truth or falsity of a last-minute attack ad prior to an election.  Moreover, given the

20

complexity of some political statements, it is entirely possible that a candidate could make a truthful statement, yet the OEC would determine in a probable cause finding a few days before an election that the statement is false, penalizing the candidate for speaking the truth and chilling further truthful speech.

We can all agree that lies are bad. The problem is, at least with respect to some political speech, that there is no clear way to determine whether a political statement is a lie or the truth, and we certainly do not want the Government (*i.e.*, the OEC) deciding what is political truth anyway, for fear that the Government might persecute those who criticize the Government or its leaders. Ultimately, whether or not it is possible to create a system by which impartial citizens could identify lies from the truth is unclear. What is crystal clear, however, is that Ohio's statutes fail in this respect. The process is inherently flawed.

Accordingly, the Court finds that Ohio's political false-statements laws are more burdensome than necessary to accomplish their alleged objectives. Ohio Revised Code Sections 3517.21(B)(9)-(10) do not satisfy strict scrutiny. Therefore, Plaintiffs have established success on the merits.

### c. Facial Relief

Finally, Defendants argue that even if Ohio's political false-statements laws are unconstitutional, they should not be invalidated on their face, because in some applications they would be constitutional.

This Court acknowledges that "[a] facial challenge to a law is **no small matter**." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (emphasis

supplied).  "<u>At stake is</u> not an attempt to invalidate the law in a discrete setting but <u>an</u> <u>effort to leave nothing standing, to invalidate the law in each of its applications, to take</u> <u>the law off the books completely</u>."  *Id.* (emphasis supplied)*.*  This "momentous and consequential" relief is an "exceptional remedy."  *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013).  However, when a statute fails the applicable level of scrutiny, it invalidates the law in its entirety.  *See, e.g., Alvarez*, 132 S. Ct. at 2551 (plurality) (ruling that Stolen Valor Act as a whole "infringes upon speech protected by the First Amendment"); *Entm't Merchs. Ass'n.*, 131 S. Ct. at 2742 (affirming facial invalidation of law restricting violent video games); *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2666, 2672 (2011) (accepting plaintiffs' "facial" challenge because the statute as a whole failed strict scrutiny).

Within the First Amendment context, the plaintiff has the burden to show that the statute is overbroad.  *Speet*, 726 F.3d at 872.  A law is overbroad when "a substantial amount of protected speech both in an absolute sense and relative to [the statute's] plainly legitimate sweep" is impinged.  *Id.*  An over-breadth challenge states that, "in all its applications," the statute directly restricts protected speech and is not tailored to serve a compelling interest.  *Id.* at 873.  "[T]he as-applied challenges when the statute on its face, and therefore in all its applications, falls short of constitutional demands."  *Id.*  When a statute does not reach a substantial amount of protected speech, the over-breadth challenge fails.  *Id.*  To determine whether a statute is overbroad, the courts must construe the statute in order to know what the statute covers.  *Id.*  In construing the statute, this

Court must use "every reasonable construction … to save a statute from unconstitutionality." *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007).

Defendants suggest that because defamation and fraud are unprotected by the First Amendment, Ohio's law could be constitutionally applied to defamatory or fraudulent statements. However, the statute is not limited to such statements; it also applies to negative but non-defamatory statements, positive false statements that do not defame, and statements that cause no harm. Accordingly, the statute "requires rewriting, not just reinterpretation." *Stevens*, 130 S. Ct. at 1592 (emphasis supplied). And this Court cannot rewrite the statute "to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). That is the job of the Legislature.

### B.    Irreparable Harm

In considering imposition of an injunction, courts must consider whether the plaintiff will suffer irreparable injury without the injunction. *Certified Restoration*, 511 F.3d at 550. "To demonstrate irreparable harm, the plaintiffs must show that … they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet*, 305 F.3d at 578.

The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). If a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated. *Bonnel v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). *See, e.g., Hillside*

*Productions, Inc. v. Duchane*, 249 F.Supp.2d 880, 900 (E.D. Mich 2003) (where a plaintiff's procedural due process rights were likely violated, a finding of irreparable harm should follow <u>as a matter of law</u>). Here, where Plaintiffs have evidenced that Ohio Revised Code Sections 3517.21(B)(9) and 3517.21(B)(10) are unconstitutional, a finding of irreparable harm is implicit.

### C.  Substantial Harm to Others or the Public

The final factor in the injunctive relief analysis is whether granting the injunction would cause harm to others and/or serve the public interest. "The irreparable injury [the plaintiffs] will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

The Supreme Court stated this summer that "denying prompt judicial review would impose a substantial hardship on [SBA], forcing [it] to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other." *SBA List*, 134 S. Ct. at 2347. Given that the 2014 elections are less than two months away, this Court's failure to resolve promptly the question of injunctive relief would compel SBA to make the Hobson's choice the Supreme Court foretold (*i.e.*, "refrain[] from core political speech … or engage[] … in that speech and risk[]… criminal prosecution"). *Id.*

And "it is always in the public interest to prevent the violation of a party's constitutional rights." *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). *See also Dayton Area Visually Impaired Persons, Inc. v.*

*Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (that is, "the public as a whole has a

significant interest in … protection of First Amendment liberties.").

Accordingly, in balancing the factors, the Court finds that they weigh heavily and

determinatively in Plaintiffs' favor.  Furthermore, given that there are no outstanding

factual issues that need to be resolved, the Court sees no reason to delay issuing a

permanent injunction.

## IV.   CONCLUSION

For these reasons, Plaintiffs' motions for a preliminary injunction (Docs. 120, 121)

and for summary judgment (Doc. 126) are **GRANTED**.  The Court **PERMANENTLY**

**ENJOINS** the Ohio Elections Commission and its members from enforcing Ohio's

political false-statements laws, *i.e.*, Ohio Revised Code Sections 3517.21(B)(9)-(10).

Defendants' cross-motion for summary judgment (Doc. 134) is **DENIED**.

The Clerk shall enter judgment accordingly by separate entry, whereupon this

Court's decision shall be a final, appealable Order, and the Clerk shall terminate this case

in this Court.[7]

**IT IS SO ORDERED**.

Date:  September 11, 2014                          *s/ Timothy S. Black*
                                                  Timothy S. Black
                                                  United States District Judge

---

[7] Federal Rule of Civil Procedure 65(c) ("no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant") applies only to temporary restraining orders or preliminary injunctions.  Here, the Court is entering a permanent injunction and therefore Rule 65(c) does not apply and no bond is required.  *See also Ty, Inc. v Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002).